Dan TURNER and Henry Bonaparte, Appellants,

v.

Troy PERRY, Appellee.

No. 14–07–01060–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 27, 2009.

Rehearing Overruled Feb. 26, 2009.

Jon Erik Nichols, Kristi Michelle Huer Herring, Jonathan Griffin Brush, Houston, for appellants.

James L. Reed, Michael Antoine Ackal, III, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices GUZMAN and BROWN.

## OPINION

EVA M. GUZMAN, Justice.

In this accelerated interlocutory appeal, police officers Dan Turner and Henry Bonaparte challenge the trial court's denial of their assertions of qualified and official immunity. Appellee Troy Perry sued appellants, his former supervisors, alleging that they took adverse employment actions against him and slandered him in retaliation for his official complaint accusing them of unlawful conduct. Appellants contend that (a) they acted in response to unprotected speech, (b) their employer's grievance process provided Perry with adequate due process, and (c) their representations of Perry's conduct were made in good faith. We reverse the trial court's denial of summary judgment based on qualified immunity to one of Perry's First Amendment claims, affirm the trial court's ruling in all other respects, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Alief Independent School District ("AISD") employed appellee Troy Perry as a "Peace Officer–Gang Enforcement Officer" in 2004. Sergeant Henry Bonaparte was Perry's direct supervisor, and Captain Dan Turner was the captain of the AISD police department. As a police officer responsible for investigating gang-related activity, Perry interviewed students and obtained and evaluated documents containing gang-related information. According to Plaintiff's Seventh Amended Petition, Perry completed an application in July 2004 to submit AISD's "gang database" to the Department of Public Safety ("DPS"); however, Turner did not sign the application, and the appellants did not allow Perry to release the information to DPS.

In April 2005, information Perry had learned through his work as a gang officer caused him concern that there would be an increased risk of gang-related violence at several AISD schools on May 5 and May 16, 2005. He communicated the information he had gathered to gang investigators of several police agencies and the office of

the Texas Attorney General. On April 21 and 22, 2005, he emailed the information to Turner, Bonaparte, and other law enforcement agencies and personnel. According to Perry, DPS employee Vicki Norris contacted him and asked if he would allow her to post this information to a website on his behalf. The website, referred to in the record as "CLEO," is a password-protected site accessible to criminal-justice personnel. To obtain access, an officer must complete a written application, which must also be signed by the officer's supervisor. Perry had completed an application, but because appellants refused to sign it, he could not access CLEO directly. Perry therefore authorized Norris to post the information for him.

After the information was published on the CLEO website, Bonaparte emailed Perry that "the [AISD] superintendent's office had been inundated with calls for information in reference to the warning you had posted on the CLEO web site." On May 4, 2005, Bonaparte again emailed Perry, stating, "From this point on no information[ ] regarding activities in and around this district will be given out without prior written approval from [a] departmental supervisor. Your decision to export data is causing a number of problems; this directive includes both written and verbal communications." In addition, Perry was demoted from his position as a gang officer to a position as a patrol officer and placed on a "growth plan" on July 15, 2005. According to Perry, both Turner and Bonaparte informed him that these disciplinary measures were, in part, a response to the CLEO posting. Perry filed a grievance concerning that action, and in an undated memorandum, Bonaparte summarized the discussion that occurred during Perry's grievance hearing on September 13, 2005. According to Bonaparte, Perry contended that he was reassigned from his position as a gang officer to a

position as a patrol officer as a "direct result of his disclosure of a gang[-]related issue via a national web site." Bonaparte further stated that "Perry did not perform in a satisfactory fashion during his tenure as a gang officer and he will not be returned to the position." He concluded that "Perry has had problems with following the chain of command and has disseminated information to other outlets without supervisory approval."

While these events were unfolding, Perry allegedly learned that Bonaparte and Turner had entered Perry's office while he was away and removed a traffic citation he had written concerning an AISD teacher. According to Perry, Bonaparte told him that the citation was removed because the teacher was "politically connected." On July 20, 2005, Perry asked the advice of an acquaintance at the Harris Count District Attorney's Police Integrity Unit, and he was told that he should collect evidence of the alleged misconduct. Perry then obtained still photographs from a surveillance tape that reportedly shows Bonaparte and Turner entering Perry's office and leaving with a piece of paper. On or about October 18, 2005, Perry lodged an official complaint with an assistant district attorney in which he alleged that Bonaparte and Turner had unlawfully tampered with a government record. According to Perry, an assistant district attorney told him that the cited teacher said Turner had assured her that he would "take care of" the citation.

On October 27, 2005, Perry filed a complaint with the school district in which he alleged that appellants had retaliated against him for reporting their conduct to the district attorney's office. In connection with this grievance, Perry also related that he arrested a female student at Elsik High School on September 21, 2005, and at Turner's instruction, transported the stu-

dent to the AISD police station for processing. At the station, Perry telephoned an assistant district attorney who accepted Perry's charge that the student resisted arrest. Perry also intended to arrest the student for "Disorderly Conduct—Abusive Language," but he was notified by the police dispatcher that Turner had ordered him to leave the student in the custody of Officer Wayne Cox and return to Elsik High School. While he was away, Cox issued the student a citation for "Disruption of Class" and released her. In a subsequent letter to Bonaparte, Perry stated that he advised the assistant district attorney that Cox had erroneously released the student, and the attorney advised Perry to complete the charges and process the arrest at a later date. Perry also complained about the release to Turner, who allegedly responded that he, Turner, had been "ordered to issue all students who were arrested at Elsik citations and release them." Perry asserts that he completed an offense report on the day of these events regarding the charges against the student, and appellants expressed no objection to the report at that time.

The charges against the Elsik High School student were entered into the Juvenile Offender Tracking system on September 29, 2005,[1] and Perry attempted unsuccessfully to apprehend the student on the same day. When he returned to the station, he was given a letter of reprimand, dated September 28, 2005, in which Turner stated that Perry violated AISD's procedural requirement that all officers notify an AISD police supervisor of an alleged criminal offense before contacting the Harris County District Attorney's office to institute charges. The letter continued, "You are notified by receipt of this memo-randum that you are required to contact an AISD Police Supervisor prior to contacting any ADA for charges." Perry concluded that the reprimand, "arbitrarily enforcing an unwritten practice," was issued to retaliate against him for reporting Bonaparte and Turner to the Harris County District Attorney's office for illegal conduct.

Perry filed further grievances on October 11, November 2, and November 11, 2005. After he filed the November 11th grievance, AISD's Director of Human Relations, Rose Benitez, summoned Perry to her office. In a meeting between Benitez, Perry, and Bonaparte, AISD terminated Perry's employment. On November 17, 2005, Benitez wrote to Perry and stated that, at her November 11th meeting with him, they discussed issues concerning Perry's job performance, including his "[i]nappropriate interaction with students." Benitez further stated that a copy of the letter would be placed in Perry's personnel file.[2]

On January 12, 2006, Perry sued Turner, Bonaparte, and AISD. He alleged that AISD terminated his employment in retaliation against him for reporting violations of law by Turner and Bonaparte. He asserted claims against Turner and Bonaparte in their individual capacities for slander and intentional infliction of emotional distress. In addition, he alleged that they took adverse employment actions against him in violation of his rights under the First and Fourteenth Amendments.

Turner and Bonaparte moved for partial traditional summary judgment on the grounds that they are protected from suit by qualified immunity and official immunity, and Perry failed to exhaust administra-

1. Perry attributes the delay in entering the charges into the computer system to school closures in connection with Hurricane Rita.

2. Perry filed another grievance on November 28, 2005, and an unsuccessful grievance hearing was held on January 19, 2006.

tive remedies. The trial court denied the motion on November 26, 2007, and this accelerated interlocutory appeal timely ensued.

## II. ISSUES PRESENTED

In their first issue, Turner and Bonaparte contend the trial court erred in denying their summary-judgment motion asserting qualified immunity to Perry's claims that they violated his constitutional rights to freedom of speech and due process. In their second issue, appellants contest the trial court's failure to grant summary judgment based on appellants' assertions of official immunity to Perry's claims of slander.[3]

## III. STANDARD OF REVIEW

To succeed in a motion for traditional summary judgment under Texas Rule of Civil Procedure 166a(c), the movant must establish that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex. 2005) (citing *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991)). In reviewing a summary judgment, we consider the evidence in the light most favorable to the non-movant and resolve any doubts in the non-movant's favor. *Id.* (citing *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985)).

## IV. ANALYSIS

### A. Qualified Immunity

Qualified immunity protects governmental officials performing discretionary functions from suit if their actions were objectively reasonable in the light of then clearly-established law. *Anderson v.*

*Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Stated differently, the question of whether an official may be held personally liable for an allegedly unlawful official action is determined by examining the objective legal reasonableness of the action in light of the laws that were clearly established at that time. *Id.* at 639, 107 S.Ct. at 3038 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982)). Because the official's actions are measured against a standard of objective legal reasonableness, the official's subjective belief that his conduct was lawful is irrelevant to the analysis. *Id.* at 641, 107 S.Ct. at 3040.

In analyzing whether qualified immunity applies, we first determine if the facts, taken in the light most favorable to the party asserting injury, showed that the official's conduct violated a constitutional right. *See Scott v. Harris,* 550 U.S. 372, 377–78, 127 S.Ct. 1769, 1774–75, 167 L.Ed.2d 686 (2007) (noting that, when reviewing ruling on an official's motion for summary judgment claiming qualified immunity, the court usually adopts the plaintiff's version of the facts). If the facts as alleged constitute such a violation, we consider whether the right was clearly established in light of the specific context of the case. *Id.* 127 S.Ct. at 1774; *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The right was "clearly established" if the contours of the law at the time of the conduct at issue gave fair warning that such conduct would violate the employee's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) (citing *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d

---

3. On appeal, the parties do not address Perry's claim for intentional infliction of emotional distress or appellants' contention that

Perry failed to exhaust administrative remedies.

432 (1997)); *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); *Eastland County Coop. Dispatch v. Poyner,* 64 S.W.3d 182, 195–96 (Tex.App.-Eastland 2001, pet. denied) (applying *Saucier*).

### 1. Claims Arising from Alleged Violations of Perry's First Amendment Rights

▆▆▆ Since 1968, courts have followed the *Pickering* balancing test to determine if the speech of a public employee is protected by the First Amendment. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will County, Ill.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). To apply the *Pickering* test in determining whether a public employer unconstitutionally penalized an employee for engaging in protected speech, we balance (a) the interest of the employee, as a citizen, in commenting upon matters of public concern, and (b) the interest of the governmental agency, as an employer, in promoting the efficiency of the public services it performs. *Id.* at 568, 88 S.Ct., at 1734–35. In analyzing the constitutionality of the employer's actions, "courts look to the facts as the employer *reasonably* found them to be." *Waters v. Churchill,* 511 U.S. 661, 677–78, 114 S.Ct. 1878, 1889, 128 L.Ed.2d

686 (1994) (plurality op.).[4] Whether an employee's speech addresses a matter of public concern is determined by the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

▆▆▆ In *Connick,* the Court discussed several facts on which it relied in analyzing whether speech "touched upon a matter of public concern." *Id.* at 149, 103 S.Ct. at 1691. These factors included:

- whether the speech was merely an extension of an employment dispute;[5]

- whether the speech was focused on "gather[ing] ammunition for another round of controversy" with the employee's superiors;[6]

- whether the speech occurred at work or on the speaker's own time and outside of the working areas of the office;[7]

- whether the speech impeded the ability of the speaker or other employees to perform their duties;[8]

- whether the employee sought to inform the public that the employer "was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases";[9] and

- whether the employee "[sought] to bring to light actual or potential

4. The plurality opinion may be taken to state the holding of the Court. As J. Souter explained in a concurring opinion, a majority of the Court agreed that, in the absence of pretext, employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable. *Waters,* 511 U.S. at 685–86, 114 S.Ct. at 1893 (Souter, J., concurring). A different majority agreed that employers whose conduct fails the plurality's reasonableness test have violated the Free Speech Clause. *Id.*

5. *Id.* at 148, 103 S.Ct. at 1690.

6. *Id.* at 148, 103 S.Ct. at 1691.

7. *Id.* at 152–53, 103 S.Ct. at 1693.

8. *Id.* at 151, 103 S.Ct. at 1692.

9. *Id.* at 148, 103 S.Ct. at 1690–91.

wrongdoing or breach of public trust" on the part of superiors.[10]

Although these factors are not a general standard against which statements must be judged, they illustrate the application of the "content-form-context" test required by *Pickering*. *See id.* at 147, 103 S.Ct. at 1690.

In 2006, the United States Supreme Court decided *Garcetti v. Ceballos*, in which it further refined the First Amendment balancing test applicable to governmental employees. 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As the Fifth Circuit Court of Appeals explained, *Garcetti* "added a threshold layer" to the *Pickering/Connick* analysis. *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008).[11] In *Garcetti*, a supervising district attorney was disciplined after writing a memorandum that his employer considered inflammatory. *Garcetti*, 547 U.S. at 420–23, 126 S.Ct. at 1959–61. The Court explained that the employee wrote the memorandum "as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* at 421, 126 S.Ct. at 1960. Significantly, the Court held that, as a threshold matter, employees are not speaking as citizens for First Amendment purposes when they speak "pursuant to their official duties." *Id.* Thus, under *Garcetti*, the re-

viewing court must shift its initial focus "from the content of the speech to the role the speaker occupied when he said it." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir.2007) (per curiam).

In sum, the inquiry regarding whether a governmental employee's speech is constitutionally protected now involves three considerations. First, we must determine whether the employee's speech was made pursuant to his or her official duties. *Davis*, 518 F.3d at 312.[12] If so, then the speech is not protected by the First Amendment, because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti*, 547 U.S. at 421–22, 126 S.Ct. at 1960. Second, if the speaker did not engage in the speech pursuant to official duties, then we must determine whether the speech touched upon a matter of public concern. *Davis*, 518 F.3d at 312. Third, if the speech does pertain to a matter of public concern, we apply the *Pickering/Connick* test to balance the employee's interest in expressing his concerns with the governmental employer's interest in performing its services efficiently. *Id.*

Subsequent cases have further clarified *Garcetti*'s effect on the *Pickering/Connick* test. For example, in *Nixon v. City of*

---

**10.** *Id.*

**11.** Although the events in this case predate *Garcetti*, we apply its threshold requirement when determining whether Perry engaged in protected speech. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (explaining that the Supreme Court's announcement of a rule of federal law applies to all open cases and events, regardless of whether such events predate or postdate the Court's announcement of the rule). We do not, however, consider *Garcetti* as part of the law that was "clearly established" at the time appellants are alleged to have violated Perry's constitutional rights.

*See Hope*, 536 U.S. at 741, 122 S.Ct. at 2516 (describing the test for ascertaining the "clearly established" law at the time of the alleged violations).

**12.** That the employee's speech concerns facts learned while working is not dispositive. *See Charles v. Grief*, 522 F.3d 508, 513–14 (5th Cir.2008) (Texas Lottery Commission employee's allegations of Commission misconduct, made to members of the Texas legislature with oversight over the Commission, is protected even though the speech concerned facts learned at work).

*Houston*, the Fifth Circuit Court of Appeals considered a police officer's statements to the media criticizing, among other things, his employer's high-speed pursuit policy. 511 F.3d 494, 496–97 (5th Cir.2007). Some of the statements were made at an accident scene while the officer was in uniform and on duty; others appeared in magazine articles written by the officer. *Id.* In the articles, the officer also "characterized inner-city minority residents as 'rats,' women with cats as mentally unstable, homeless people as 'criminals,' and children with problems as 'freaks.' " *Id.* at 500 n. 9.

On appeal, the court held that the statements at the accident scene were made pursuant to the officer's employment responsibilities, and thus, were not subject to First Amendment protection. *Id.* at 498. As the court explained, "the fact that [the police officer] performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors does not convert his statement . . . into protected citizen speech." *Id.* at 498–99. Although the court did not determine whether the officer acted pursuant to his professional duties in writing the magazine articles, it held that the articles were unprotected under the *Pickering* test in any event because they brought " 'the mission of the [police department] and the professionalism of its officers into serious disrepute,' " thereby undermining citizen confidence in the department and impairing the performance of its functions. *Id.* at 500–01 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 81, 125 S.Ct. 521, 524, 160 L.Ed.2d 410 (2004)).[13] In reaching this conclusion, the court emphasized that it was "mindful of the paramilitary structure of the police

department and the greater latitude given their decisions regarding discipline and personnel regulations." *Id.* at 501.

### a. Causing Gang–Related Information to be Posted on CLEO

■ In their first issue, appellants contend that the trial court erred in denying their motion for qualified immunity to Perry's claims arising from his release of gang-related information for posting to the CLEO website. According to Perry, this speech was protected by the First Amendment, and thus, appellants violated his constitutional rights by subjecting him to employment discipline for engaging in this speech. Appellants assert that this speech is not protected under *Garcetti* because it relates to Perry's employment. We agree.

Although the parties have not identified the statement in the record and we do not know its exact content, Perry's own characterizations of the statement and the context in which it was made place it firmly within the scope of his employment responsibilities. For example, in his petition, Perry repeatedly states that he was "retaliated against for performing [his] job." *See, e.g.,* Pl.'s Seventh Am. Pet., ¶ 17 ("Because [Perry] sought to properly perform his job, including making relevant and material communication with appropriate officials, [Perry] was the target of retaliation by [appellants]."). Activities undertaken in the course of performing one's job, even if unauthorized, are *conducted* pursuant to official duties. *Nixon*, 511 F.3d at 497–99 (citing *Williams*, 480 F.3d at 693).

We further note that CLEO can be accessed only by law enforcement personnel

---

**13.** In *City of San Diego*, the Supreme Court held that the police department had a legitimate and substantial interest in preventing one of its officers from selling pornographic videos of himself on eBay where the officer

identified himself as a law enforcement officer, appeared in uniform, and performed indecent acts. *Nixon*, 511 F.3d at 500–01 (citing *City of San Diego*, 543 U.S. at 81, 125 S.Ct. 521).

who have been given passwords, and Perry could not obtain a password without a superior's authorization. He previously sought and was denied permission to obtain a password to access CLEO directly. Moreover, the summary-judgment evidence includes Perry's testimony that the speech at issue was related to his position as a gang officer performing an investigation as provided in his job description:

> If you look at my job description for the gang officer, it specifically says that I am to deal with other agencies. So, did I have prior—I already had prior permission to—to deal with other agencies. It was part of my job. It was part of what I did.
>
> . . .
>
> The event [i.e., the gang violence expected in May 2005] was something I had heard about. I was in the investigation stage. If you read the content of what I sent out, it simply was asking for information.
>
> . . .
>
> Again, my job description and—and what I understand my—my job to be and what the policy says is that I—if I had evidence of a specific incident then I need to make that appropriate—to make that known. I was gathering that inform—all I had was—was minor information at this time when I sent that out, and I was looking for more confirmation. So, do I—did I feel it was necessary [to obtain permission before releasing the information]? No, I was doing what I was supposed to be doing in that I was trying to gather information to see how valid what I had heard from another

source and what I had been hearing in the district was.

According to his own testimony, Perry was investigating gang activity and requesting confirmation of information he learned in his investigation. Although a job description alone is not dispositive of the scope of an employee's duties, Perry's understanding of his job responsibilities is supported by AISD policies included in the summary-judgment record.[14]

Because private citizens do not have a right to post gang-related information to CLEO, there is "no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424, 126 S.Ct. at 1961. This assessment is unchanged by the fact that Perry released information to another governmental employee for posting to the site, thereby accomplishing indirectly what he had been denied permission to do directly. Appellants produced evidence that Perry's conduct was insubordinate in that it circumvented their decision to refuse authorization for him to access CLEO directly. In addition, they produced uncontroverted evidence that Perry's conduct generated ill-will and threatened to disrupt the school district's normal functioning on the days identified by Perry as posing an increased risk for gang violence.

In his response to the motion for summary judgment, Perry stated that he released information for posting on the CLEO website "as a concerned citizen who is concerned not only about the public welfare, but also as a citizen concerned about the safety of other law enforcement personnel."[15] This statement is insuffi-

---

**14.** For example, a policy entitled "Alief ISD Policy CKE (Legal)" states that a "peace officer may provide assistance to another law enforcement agency...."

**15.** In Perry's Seventh Amended Petition, however, he alleged that he "was reprimanded

even though the AISD Gang Officer's stated responsibilities included protecting AISD students and personnel, and the responsibility to work with other agencies to track, monitor and document criminal gang sets, affiliates and associates."

cient to bring the communication at issue—i.e., statements by a gang officer to other law enforcement personnel regarding his investigation of gang-related activity—within the protection of the First Amendment. *See Davis v. Ector County, Tex.*, 40 F.3d 777, 782 (5th Cir.1994) ("[A] proper inquiry does not elevate motive to a determinative factor; instead, we are to examine the form, content, and context of the statement."). Given the forum in which the speech occurred, Perry's inability to access the website directly without his supervisor's authorization, the particularized roles of the speaker and the audience, and the content of the speech as described by Perry, we conclude that his disclosure of information for posting to the CLEO website was performed pursuant to his responsibilities as a gang officer, and as such, is not protected. We therefore agree with appellants' contention that this speech was not protected by the First Amendment, and we sustain their first issue as it pertains to this communication.

**b. Reporting Appellants' Allegedly Unlawful Conduct to the Harris County District Attorney**

In the remainder of their first issue, appellants contend the trial court erred in denying them qualified immunity from Perry's claims arising from his report to the Harris County District Attorney that appellants unlawfully removed a citation from Perry's citation book. Again, *Garcetti* dictates that we begin our analysis by determining if Perry engaged in the speech at issue pursuant to his employment responsibilities.

Because Perry is a police officer and his speech consisted of reporting his suspicions of unlawful activity, appellants contend that Perry engaged in this speech pursuant to his employment. In support of this argument, appellants emphasize that they were accused of unlawfully removing a citation. They contend that Perry "only had the authority to write tickets because he was a police officer; his reporting of the removal of a ticket, therefore, is necessarily related to [his] employment as a police officer."

■ This argument is without merit. The speech at issue consists of Perry's report to the district attorneys' office alleging that appellants unlawfully tampered with an existing government record; the identity of the person who created the record is irrelevant.

Appellants also contend that this speech is unprotected pursuant to *Garcetti* because Perry communicated his allegations to the district attorney's office while at work and in the course of performing his duties. Perry, however, testified without contradiction that he communicated with the district attorney's office via cell phone, and did not recall using the office telephone for that purpose. Because appellants' argument relies on facts that are not established in the record, it cannot support reversal. *See Scott*, 550 U.S. at 379–81, 127 S.Ct. at 1775–76; Tex.R. Civ. P. 166a(c); *Green v. Alford*, 274 S.W.3d 5, 17 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (op. on en banc reh'g) (noting that an appellate court will reverse the trial court's denial of a qualified-immunity summary-judgment motion "only if the evidence conclusively proves facts establishing his entitlement to official immunity as a matter of law").

■ Having concluded that Perry was not acting pursuant to his employment responsibilities when reporting his suspicions of misconduct to the district attorney's office, we proceed to the *Pickering/Connick* test and determine whether the speech addressed a matter of public interest. Some issues are inherently subjects of public concern. *Connick*, 461 U.S. at 148,

103 S.Ct. at 1691 n. 8 (racial discrimination) (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979)). The report of unlawful conduct by police officers is one such issue. *Id.* at 148, 103 S.Ct. at 1690–91 (communications to inform the public that the employer "was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases" is a matter of public concern); *id.* (public has an interest in speech intended "to bring to light actual or potential wrongdoing or breach of public trust" on the part of public employees); *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191–92 (5th Cir.1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, *especially when it concerns the operation of a police department.*") (emphasis added, footnote omitted). We therefore conclude, as a matter of law, that the speech at issue addressed a matter of public concern.

▮ Finally, we must balance (a) the interests of Perry and the general public in allowing Perry to participate in speech on this issue, and (b) AISD police department's legitimate purpose in "promot[ing] efficiency and integrity in the discharge of official duties,"[16] and maintaining " 'proper discipline in the public service.' "[17] "This involves whether the speech: (1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning." *Brawner*, 855 F.2d at 192. Significantly, however, the absence of protection for the kind of speech at issue here would undermine

rather than promote efficiency and integrity. "[I]f the allegations of internal misconduct are indeed true, [Perry's] statements could not have adversely affected the proper functioning of the department since the statements were made for the very reason that the department was not functioning properly due to corruption." *Id.* On this record, the public's interest in Perry's speech outweighs the legitimate interests of his governmental employer; thus, application of the *Pickering/Connick* test leads us to conclude that Perry's speech to the district attorney's office was protected by the First Amendment.

▮ Appellants contend that they nevertheless are entitled to qualified immunity because they did not violate a clearly established right protecting Perry's speech. To be considered clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. According to appellants, "[t]he act in question in this case, disciplining a subordinate employee for violating a policy or procedure, does not constitute a clearly established violation of [Perry's] constitutional rights."

At the time of these events, however, it was well-established that a legitimate report of unlawful police conduct is protected by the First Amendment. *See, e.g., Davis v. Ector County, Tex.*, 40 F.3d 777, 782 (5th Cir.1994); *Brawner*, 855 F.2d at 192; *Lott v. Andrews Ctr.*, 259 F.Supp.2d 564, 568 (E.D.Tex.2003) (filing a legitimate criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right); *see also Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502,

---

**16.** *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring).

**17.** *Connick,* 461 U.S. at 150–51, 103 S.Ct. at 1692 (quoting *Ex parte Curtis,* 106 U.S. 371, 1 S.Ct. 381, 384, 27 L.Ed. 232 (1882)).

507 (Tex.2002) ("A citizen has a clear legal right to report criminal misconduct to authorities...."); *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320–21 (Tex. 2002) (clarifying that a report of an alleged violation of law may be in good faith even though incorrect, if a reasonable person with the employee's level of training and experience would also have believed that a violation had occurred). The only policy identified by appellants which such speech could have violated was the policy communicated to Perry by Turner on September 29, 2005: "You are notified by receipt of this memorandum that you are required to contact an AISD Police Supervisor prior to contacting any [assistant district attorney] for charges." [18]

■ Such a policy cannot be applied lawfully to authorize adverse employment action against a public employee "who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." *See* Tex. Gov't Code Ann. § 554.002(a) (Vernon 2004).[19] To the contrary, section 554.002 is intended to (1) enhance openness in government by protecting public employees who inform proper authorities of legal violations, and (2) secure governmental compliance with the law on the part of those who direct and conduct governmental affairs. *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 752 (Tex.App.-Fort Worth 2003, pet. denied) (op. on reh'g) (citing *Upton County v. Brown*, 960 S.W.2d 808, 817 (Tex.App.-El Paso 1997, no pet.) and *Tarrant County v. Bivins*, 936 S.W.2d 419, 421 (Tex.App.-Fort Worth 1996, no writ)). Law enforce-

ment officers are not exempted from the statute's protections. *See* Tex. Gov't Code Ann. § 554.002; *Harris County Precinct Four Constable Dep't v. Grabowski*, 922 S.W.2d 954, 955–56 (Tex.1996) (per curiam); *Teague*, 111 S.W.3d at 752–754; *see also United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356,19 L.Ed.2d 426 (1967) ("The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints...."). Moreover, AISD expressly incorporated the "whistleblower protection" of section 554.002 among the employee rights and privileges enumerated in its printed policies.

Because Turner and Bonaparte failed to demonstrate their entitlement to official immunity for Perry's claims arising from his report of appellants' suspected misconduct, we overrule the remainder of appellants' first issue as it pertains to this speech.

### 2. Claims Arising from Alleged Violations of Fourteenth Amendment Rights

Appellants next challenge the trial court's failure to grant summary judgment against Perry on his claim that appellants took adverse employment action against him in violation of his Fourteenth Amendment right to due process. We begin our analysis by determining whether Perry was deprived of a protected interest, and, if so, what process was his due. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982); *Univ. of Tex. Med. Sch. at*

---

18. During his deposition, Turner testified that it was part of AISD police department's "procedure" to obtain prior approval from a supervisor before disseminating "juvenile information and information that could cause alarm." Turner denied that this was a "policy."

19. An appropriate law enforcement authority includes governmental entities that the employee in good faith believes are authorized to investigate or prosecute a violation of criminal law. *Id.* § 554.002(b)(2).

*Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995).

A property interest protected by procedural due process arises where an individual has a legitimate claim of entitlement that is created, supported, or secured by rules or mutually explicit understandings. *Alford v. City of Dallas,* 738 S.W.2d 312, 316 (Tex.App.-Dallas 1987, no writ). Property interests also can be created by state law. *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 756, 125 S.Ct. 2796, 2803, 162 L.Ed.2d 658 (2005). In their motion for traditional summary judgment regarding Perry's Fourteenth Amendment claim for violation of his due process rights, Turner and Bonaparte asserted that Perry was an at-will employee with no property interest in continued employment. Perry responded that he had a protected property interest in continued employment pursuant to Texas Government Code sections 614.021–.023, which were expressly adopted in AISD's policy manual and which Turner and Bonaparte had previously applied to Perry. *See* TEX. GOV'T CODE ANN. §§ 614.021–.023 (Vernon 2004 and Supp.2008).

Section 614.022 of the Texas Government Code, entitled "Complaint to be in Writing and Signed by Complainant," provides, "To be considered by the head of a state agency or by the head of a fire department or local law enforcement agency, the complaint must be: (1) in writing; and (2) signed by the person making the complaint." *Id.* § 614.022. Section 614.023, entitled "Copy of Complaint to be Given to Officer or Employee," further provides:

(a) A copy of a signed complaint against a law enforcement officer of this state ... or peace officer appointed or employed by a political subdivision of this state shall be given to the officer or employee within a reasonable time after the complaint is filed.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

(c) In addition to the requirement of Subsection (b), the officer or employee may not be indefinitely suspended or terminated from employment based on the subject matter of the complaint unless:

(1) the complaint is investigated; and

(2) there is evidence to prove the allegation of misconduct.

*Id.* § 614.023.[20] We previously construed these statutes and concluded that the complaint must be in writing and signed by the person who claims to be the victim of misconduct. *Guthery v. Taylor,* 112 S.W.3d 715, 721–23 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Here, state law and AISD policy[21] created a property interest: in the absence of complaints that were signed, delivered, investigated, and supported by evidence, Perry had a legitimate expectation of continued employment secured by sections 614.021–023 of the Texas Government Code.

---

**20.** Act of May 16, 1969, 61st Leg., R.S., ch. 407, § 1, 1969 Tex. Gen. Laws 1333, 1333–34 (formerly codified as Vernon's Ann. Civ. St. art. 6252-20, eff. June 2, 1969), *recodified by* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 678–79, *amended by* Act of May 19, 2005, 79th Leg., R.S., ch. 507, § 1, 2005 Tex. Gen. Laws 1394, 1394, eff. Sept. 1, 2005.

**21.** *See County of Dallas v. Wiland,* 216 S.W.3d 344, 348 (Tex.2007) (stating that at-will employment of public employees may be modified by agreement with the employer, as in a personnel manual). Here, the AISD police force expressly adopted the state statutes as its own policy.

Having determined that Perry had a protected property interest, we must now identify the process required to protect that interest. Generally, due process is measured by a flexible standard that depends on the practical requirements of the circumstances. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). This standard includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335, 96 S.Ct. at 903.

According to appellants, the grievance process provided Perry with any due process to which he was entitled. We cannot agree that this substitute procedure protected Perry's due process rights. By enacting sections 614.021–023, of the Government Code, the State provided covered employees with procedural safeguards to reduce the risk that adverse employment actions would be based on unsubstantiated complaints. Moreover, the State determined that the value of these protections outweighs the fiscal and administrative burdens incurred by complying with statutory requirements. In contrast, the summary-judgment evidence demonstrates that the procedures appellants followed impaired Perry's ability to investigate or defend against the complaints made against him.

Rather than requiring complaints of alleged misconduct to be signed by the victim, appellants accepted and acted upon complaints that did not identify the true complainant. Instead, these complaints expressed the conclusions of other peace officers based on general allegations of unidentified people. For example, Officer Wayne Cox wrote,

> In speaking with fellow officers, who wish to remain anonymous, I feel that Officer Troy Perry is threatening to undermine your authority as chief and erode the good order and discipline of the department. I respectfully request that he not be allow[ed] to interact with students at the Elsik campus as he tends to incite or inflame already volatile situations by his demeanor.... I opine that Officer Perry should never have any contact with the public as he is the antithesis of a professional police officer.

Cox's partner, Officer William Britton, similarly wrote,

> It has been brought to my attention by my fellow officers that Officer Perry has been speaking ill of the department. I have been with Officer Perry on several occassions [sic] at Elsik and I feel that his actions with the students at Elsik are not that of a professional police officer. I have observed him shout, yell and degrade students with whom he was interacting.

Officer Karen Meier emailed Bonaparte that the "morale in the department and overall tension level among officers is very strained" and "most of this could be avoided if Officer Perry could keep whatever problems he has with the department and supervisors to himself and not drag everyone into it."

Deposition testimony demonstrated further problems with the procedure followed by appellants. Benitez testified that one of her job responsibilities requires her to investigate whether accusations are verifiable and truthful. Nevertheless, there was no investigation concerning Perry's release of information for posting on the CLEO website, and she does not know that any AISD employee, other than law

enforcement personnel, saw the posting. She further agreed that there is "nothing in writing, no dates, no names and no way to investigate" the allegations against Perry. Benitez conceded that she did not develop enough specific data to allow Perry to investigate "and give his side of the case," and stated her opinion that Perry could be terminated "for any reason or no reason." Rather than investigating, Benitez relied on statements concerning unidentified students, including statements from Turner and Bonaparte. Turner, however, testified that he does not remember any specific incident in which he observed Perry behaving inappropriately with students, and Bonaparte asserted his rights under the Fifth Amendment and refused to answer questions concerning this suit.[22]

In sum, appellants' failure to follow statutory procedure magnified the risk that adverse employment action would be taken based on unsubstantiated complaints. *Cf.* Tex. Gov't Code Ann. §§ 614.022, 614.023[23] (requiring complaints against police officers to be written, signed, investigated, and supported by evidence if they are used as the basis for adverse employment action). On this record, we cannot conclude that the trial court erred in denying appellants' motion for summary judgment regarding Perry's Fourteenth Amendment claims.

### B. Official Immunity

 In their second issue, appellants argue that they are entitled to official immunity from Perry's claims of slander,[24] and thus, the trial court erred in failing to grant summary judgment on this basis. Official immunity under common law is based on the need for public servants "to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation." *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex.2004). It is an affirmative defense barring state law claims against a governmental employee's performance (1) of discretionary duties, (2) within the scope of the employee's authority, (3) provided that the employee acts in good faith. *Id.* at 422; *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580–81 (Tex.2000); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). The doctrine is based on the theory that the threat of liability will make public officials unduly timid in carrying out their official duties, and effective government will be promoted if officials are freed of the costs of vexatious and frivolous litigation. *Westfall v. Erwin*, 484 U.S. 292, 295, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988), *superseded by statute on other grounds*, 28 U.S.C. §§ 2671–2679 (1989 Supp.), *as recognized in United States v. Smith*, 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). Thus, immunity from state-law claims is intended to insulate essential governmental functions from the harassment of litigation and remove the deterrent to public service posed by the threat of heavy personal liability for errors in judgment. *See Ballan-*

---

**22.** *Cf. Fudge v. Haggar*, 621 S.W.2d 196, 197–98 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.) (holding that a written, signed complaint by an internal investigator concerning police officer's improper release of prisoner, supported by affidavits from "pretrial release employees," fulfilled statutory requirements because "the entire investigation began within the police department").

**23.** To the contrary, Benitez testified that she did not investigate the complaints.

**24.** Perry's slander claim is primarily based on appellants' representations that he engaged in "inappropriate interactions with students."

*tyne,* 144 S.W.3d at 424; *Kassen v. Hatley,* 887 S.W.2d 4, 8 (Tex.1994).

■ On appeal, the parties have focused their arguments on the element of good faith. To determine whether a public official has acted in good faith, we look to the objective standard adopted in *Chambers,* 883 S.W.2d at 656. The summary-judgment movant must produce evidence that a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 (Tex. 1997).

■ Appellants, however, failed to produce evidence that a reasonable officer in the same or similar circumstances could have believed that statements such as those made by Turner and Bonaparte were justified. In their affidavits in support of summary judgment, both Turner and Bonaparte stated:

It is within my job duties to report to ... administration, and specifically the Human Resources Department, what I believe, using my discretion, to be relevant in determining a subordinate's employment or disciplinary future.

This was the case when reporting to the administration regarding Troy Perry and his job performance. I made the determination, using my discretion and judgment, as to what would be relevant to the administration in making a decision as to Troy Perry's employment with Alief or any disciplinary measure taken. I performed these discretionary duties believing that my reporting to the administration as to Troy Perry was in the best interest of the District and believing what I reported to be true.

I received reports from various administrators within the District that Troy

Perry's behavior, with respect to his interactions with students, parents, and faculty, was inappropriate. I used my judgment and found these reports to be reliable and in the interest of Alief and its students and faculty, I reported my findings as well as my observations to ... Human Resources. This was done without malice. . . .

It is not my understanding that my issuance of disciplinary measures, such as my issuance of a verbal or written directive; the assignment of a growth plan; or even recommendation of termination, for violation of District or department policy or procedures, in any way violates the Constitutional rights of any officers under my supervision.

In effect, each appellant states that he felt justified in making the statements and reports at issue regarding Perry's conduct; however, in analyzing claims of official immunity, "consideration of *subjective* evidence of the good faith element of official immunity is inappropriate." *Ballantyne,* 144 S.W.3d at 419 (emphasis added).

Because Turner and Bonaparte failed to produce evidence that a reasonably prudent officer, in the same or similar circumstances, could have believed that their representations of Perry's conduct were justified, the trial court properly denied summary judgment on this ground. We therefore overrule appellants' second issue.

## V. Conclusion

We conclude that Perry did not engage in protected speech when he released information for publication to a law-enforcement website. Consequently, appellants are entitled to qualified immunity against Perry's claims that they violated his First Amendment rights in connection with this communication. We therefore reverse the trial court's order and render judgment

that appellants are immune from liability arising from adverse employment actions taken in response to Perry's release of information for publication to the CLEO website. In all other respects, we affirm the trial court's order denying summary judgment, and we remand the case for further proceedings consistent with this opinion.