IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 19, 2007

Charles R. Fulbruge III
Clerk

No. 07-20162

THOMAS P NIXON

Plaintiff–Appellant

v.

CITY OF HOUSTON; HAROLD HURTT

Defendants–Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-296

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

On January 27, 2006, Thomas Nixon, a patrol officer with the Houston, Texas Police Department ("HPD"), filed a § 1983 suit against the City of Houston and Chief of Police Harold Hurtt ("Appellees") for employment retaliation in violation of his First Amendment right to free speech. Specifically, Nixon claims that his fifteen-day temporary suspension and his later indefinite suspension ("termination")[1] from HPD for making various statements during media interviews and in publications he authored violated his First Amendment rights.

---

[1] The parties agree that Nixon's indefinite suspension was effectively a termination from his position as an HPD officer.

In this appeal, Nixon seeks a reversal of the district court's grant of summary judgment in favor of Appellees. Because we find that Nixon's speech was not protected by the First Amendment, we affirm.

I. BACKGROUND

A. Nixon's "The Insider" Articles

Between May 2004 and January 2006, Nixon wrote a monthly column entitled "The Insider" in 002 Magazine, a local Houston periodical.[2] In such articles, Nixon identified himself as a police officer, discussed his police-related activities, commented on his duties as an officer and HPD policies, and–according to HPD–made "caustic, offensive, and disrespectful" statements regarding certain groups of citizens, including minorities, women, and the homeless.

HPD eventually received a citizen complaint about Nixon's articles.[3] Thereafter, on or about September 28, 2005, HPD initiated an Internal Affairs investigation to determine if Nixon and his articles violated any HPD policies. The investigation determined that Nixon's activities related to authoring and publishing the articles violated numerous HPD policies and undermined the efficiency of the services provided by HPD. Consequently, HPD temporarily suspended Nixon for fifteen days without pay beginning on February 1, 2006.

B. Nixon's January 2006 Media Statements

On January 18, 2006, there was a highly publicized high-speed police pursuit involving state and local law enforcement officers, including HPD officers, and a fleeing suspect. After the fleeing suspect had been identified, HPD supervisors ordered all HPD officers to discontinue the pursuit but

---

[2] It is undisputed that Nixon did not request or receive authorization to write articles in 002 Magazine.

[3] In the complaint, the citizen questioned whether HPD shared and/or condoned the views expressed in the article and whether the author could properly fulfill the duties of an HPD officer.

permitted them to follow at a distance. Nonetheless, the fleeing suspect eventually collided with an innocent motorist. Although Nixon was not involved in the pursuit, he knew about it from local television reports he saw while he was off-duty, at home, and preparing for his shift.

As soon as his shift started, Nixon proceeded to the scene of the accident–even though he was never instructed to do so.[4] Upon arriving, Nixon asked a supervisor if anyone was going to make a statement to the media and suggested that he (Nixon) do so. After the supervisor failed to respond (other than by laughing), Nixon proceeded to speak to the media. Nixon, however, was not designated as an HPD spokesperson and was not authorized to make statements to the media at the scene. In his statement, Nixon criticized HPD's decision to disengage the pursuit and stated he was "embarrassed to be a police officer" because the department did not stop fleeing suspects.

The next day, on January 19, 2006, Nixon continued his criticism of HPD and its pursuit policy by voluntarily calling into multiple radio talk shows and by giving television interviews.[5] After his remarks on both days, Nixon informed the HPD media relations office that he had spoken to the media, presumably in an attempt to comply with his employer's media policy.

In response to these statements, HPD launched an investigation against Nixon. On June 2, 2006, HPD terminated Nixon's employment.

II. STANDARD OF REVIEW

---

[4] In going to the scene of the accident, Nixon did not inform the dispatcher when he left his vehicle and failed to timely respond to the dispatcher's call for assistance in another matter.

[5] During one of these interviews, Nixon recounted a prior incident in which he had violated HPD's pursuit policy, stating: "[I]t was a violation of policy and I admit that I did it, but you know what, I'm glad I did it because it prevented an innocent person from being injured . . . ."

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. Atkins v. Hibernia Corp., 182 F.3d 320, 323 (5th Cir. 1999). Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

III. DISCUSSION

To establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered "an adverse employment action," Alexander v. Eeds, 392 F.3d 138, 142 (5th Cir. 2004); (2) he spoke "as a citizen on a matter of public concern," Garcetti v. Ceballos, – U.S. –, 126 S. Ct. 1951, 1958 (2006); (3) his interest in the speech outweighs the government's interest in the efficient provision of public services, Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); and (4) the speech "precipitated the adverse employment action." Eeds, 392 F.3d at 142.

In the case at hand, neither party disputes that Nixon's fifteen-day suspension and later termination constituted adverse employment actions or that his speech precipitated the adverse employment actions. Thus, we must determine: (1) whether–under Garcetti–Nixon was speaking in his role as an employee or as a citizen on a matter of public concern, and (2) if he was speaking as a citizen, whether–under Pickering–his interest in speaking outweighed the government's interest in efficiency.

Under Garcetti, for an employee's speech to qualify for First Amendment protection, he must be speaking "as a citizen on a matter of public concern." 126 S. Ct. at 1958 (emphasis added). An employee is not speaking as a citizen–but rather in his role as an employee–when he "make[s] statements pursuant to [his] official duties." Id. at 1960. ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."). Garcetti, however, "did not

explicate what it means to speak 'pursuant to' one's 'official duties.'" Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 692 (5th Cir. 2007).

In Williams, the Fifth Circuit defined when an employee is speaking pursuant to his "official duties." Id. at 693-94. This Court first noted that "a formal job description is not dispositive, . . . nor is speaking on the subject matter of one's employment." Id. at 692 (citing Garcetti, 126 S. Ct. at 1959, 1961). The Court went on to state that speech required by one's position as an employee is not protected by the First Amendment.[6] Williams, 480 F.3d at 693. However, because the speech at issue in Williams was not required by Williams's job responsibilities, the Court went on to "determine the extent to which, under Garcetti, a public employee is protected by the First Amendment if his speech is not necessarily required by his job duties but nevertheless is related to his job duties." Id. (emphasis added). This Court ultimately concluded that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." Id.

If a court determines that an employee is not speaking in his/her role as an employee, but rather as a citizen on a matter of public concern, "the possibility of a First Amendment claim arises." Garcetti, 126 S. Ct. at 1958. To determine whether the First Amendment protects the employee's speech, a court proceeds to the Pickering balancing test and determines whether the interest of the government employer "in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interests, as a citizen, "in commenting upon matters of public concern." Pickering, 391 U.S. at 568.

---

[6] This Court came to this conclusion because we found that job-required duties were present in Garcetti–i.e., that Ceballos's responsibilities as a prosecutor and calendar deputy required him to make the speech at issue. Williams, 480 F.3d at 693 ("[W]hen Ceballos articulated his opinion about a case in a memorandum to his supervisor, alleging that the police acted inappropriately in gathering evidence, he did exactly what he was required to do.").

Pertinent considerations in this balancing test are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987). Furthermore, "[b]ecause police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." Tindle v. Caudell, 56 F.3d 966, 971 (8th Cir. 1995).

With this framework in mind, we turn to the speech at issue in this case: Nixon's January 2006 media statements and Nixon's "The Insider" magazine articles.

A. Nixon's January 2006 Media Statements

Under Garcetti and Williams, it is clear that Nixon's January 18, 2006 media statement at the scene of the accident is not protected by the First Amendment because it was made pursuant to his official duties and during the course of performing his job. Nixon spoke to the media while on duty, in uniform, and while working at the scene of the accident. Before he made the statement, he made an attempt to get the approval of a supervisor to do so. His statement was intended to inform the public of the circumstances of the high-speed chase, the subsequent accident, and HPD's high-speed chase policy. Quite simply, there is "no relevant analogue to speech by citizens." Garcetti, 126 S. Ct. at 1961. The fact that Nixon's statement was unauthorized by HPD and that speaking to the press was not part of his regular job duties is not dispositive–Nixon's statement was made while he was performing his job, and the fact that Nixon performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors does not convert his statement

6

at the accident scene into protected citizen speech. Furthermore, speaking with the media is arguably one of an officer's job responsibilities, as HPD's Media Relations Policy directs: "In emergency or scene related situations, officers will provide the media with information regarding the scene or event in a timely manner."[7]

Nixon's January 19 statements to various radio talk shows and television news programs–considered in isolation–more closely approximate citizen speech, as he was presumably off-duty when he made such statements. These statements, however, constitute a continuation of Nixon's accident-scene statements the previous day criticizing HPD and its high-speed pursuit policy–which, as discussed above, Nixon made in his role as an employee. Consequently, this next-day forum should not affect our analysis, and these statements are seemingly controlled by Garcetti. However, even if Nixon's January 19 media statements constitute citizen speech, such speech–in conjunction with his January 18 statements–is not afforded First Amendment protection under Pickering.

Nixon's interest in commenting upon matters of public concern–although significant–are outweighed by the government's substantial interests in the efficient provision of government services. Nixon's 2006 media statements undermined HPD's interests in maintaining discipline and order among employees and in promoting and maintaining public confidence in HPD. Nixon posed as an official HPD spokesperson at the scene of an accident and criticized HPD's handling of the high-speed pursuit at issue. Furthermore, in his January 19 media interviews, Nixon stated that he had knowingly disobeyed HPD's pursuit policy on a prior occasion and felt comfortable violating other direct orders because he has "civil service protection." Such statements and conduct

---

[7] It is also relevant that Nixon complied with this policy by notifying the media relations office of his statement at the accident scene after he made it.

smack of insubordination, and it is entirely reasonable for HPD to predict that such insubordination and likely acts of future insubordination would harm HPD's ability to maintain discipline and order in the department, morale within the department, and close-working relationships between Nixon, his fellow officers, and his supervisors.[8] Furthermore, HPD could reasonably predict that an officer criticizing HPD policy while masking as an official spokesperson at the scene of an accident and discussing his past violations of HPD policy and future willingness to violate such policies would bring the mission of HPD and the professionalism of its officers into disrepute.

B. Nixon's "The Insider" Articles

Nixon contends that the district court erred in determining that, under *Garcetti*, he was not speaking as a citizen when he wrote his articles for 002 Magazine because: (1) writing the articles was not part of his job-required duties, (2) his speech occurred outside the scope of his employment and without any authorization, and (3) his comments were directed to the general public and constituted speech that private citizens could perform. Appellees, on the other hand, contend that Nixon was speaking in his role as an officer when he penned his articles because the magazine articles were directly related to and stemmed from his employment, his views were based upon his experiences as an HPD officer, and he took deliberate steps to link his views to his position as a police officer by identifying himself as an active HPD patrolman. However, we need

---

[8] Nixon complains that "HPD failed to produce any evidence . . . that [any of] Nixon's speech caused actual harm, and not just speculative or threatened harm, to the effective and efficient operations of the Department." (emphasis added). However, a government employer need not produce evidence of actual harm or disruption to governmental operations. *Connick v. Myers*, 461 U.S. 138, 152 (1983) ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."). Consequently, courts have consistently given "substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (emphasis added).

not determine if Nixon's magazine articles were written in his role as an employee or citizen because, even if we assume that Nixon was speaking as a citizen on matters of public concern, his magazine articles are unprotected by the First Amendment under Pickering.

HPD argues that Nixon's magazine articles "[held] HPD out to embarrassment and serve[d] to undermine public confidence in the professionalism of the department and its officers," thereby interfering with the efficient operations of HPD. Given that Nixon identified himself as an HPD police officer and wrote from the perspective of an HPD police officer, and the articles made patently offensive and insensitive comments regarding certain segments of the population,[9] it was reasonable for HPD to believe that such comments and the continuation of the publication of similar articles would hinder the important relationship between HPD and the citizens of Houston. In fact, Nixon's articles drew the attention of another local publication, Houston Press. The article in Houston Press identified Nixon as veteran officer of the HPD and commented that Nixon's articles "offer[] . . . an inside look at what HPD folks are thinking." The article also comments on Nixon's article that compares inner-city minority residents to "rats" and sarcastically states: "And the relationship between HPD and minorities takes another giant step forward."[10] HPD convincingly states that its interest in maintaining public confidence is so important to its proper functioning because "HPD often relies upon members of the public to provide critical information, to serve as witnesses,

---

[9] Nixon's articles characterized inner-city minority residents as "rats," women with cats as mentally unstable, homeless people as "criminals," and children with problems as "freaks."

[10] Additionally, Nixon's articles led a citizen to submit a complaint to HPD's Internal Affairs Division, in which the citizen questioned whether HPD shared and/or condoned the views expressed in the articles and whether the author could properly fulfill the duties of an HPD officer.

to respect law enforcement authority, and to provide financial support."[11] Given the exposure of Nixon's articles to the Houston community and the caustic statements in some of his articles,[12] it was reasonable for HPD to believe that his articles would negatively impact the relationship between HPD and Houston citizens and generally bring "the mission of the [police department] and the professionalism of its officers into serious disrepute"–certainly legitimate and substantial interests, harm to which would undoubtedly impair the proper performance of HPD functions. City of San Diego v. Roe, 543 U.S. 77, 81 (2004) (holding that the San Diego Police Department had a legitimate and substantial interest in preventing one of its officers from selling pornographic videos of himself on eBay where the officer appeared in uniform, performed a parody of an officer performing indecent acts in the course of official duties, and identified himself on eBay as a law enforcement officer).

Nixon, on the other hand, asserts the same interests in his magazine articles as he did with respect to his January 2006 media statements–his interest in commenting upon matters of public concern and the public's interest in receiving information on police protection and public safety issues. The value of Nixon's articles, however, is somewhat diminished by the fact that a significant amount of his speech is directed at denigrating certain segments of the Houston population. Although Nixon's interests are substantial, they are simply outweighed by the important government interests discussed above. We

---

[11] A good relationship with the Houston community is so important that "HPD expends considerable resources in an attempt to build and maintain public confidence and respect."

[12] Not all of Nixon's articles contained denigrating statements aimed at segments of Houston's citizenry. Many of the articles were inoffensive and commented upon HPD policies that were arguably matters of public concern. Appellees, however, complain that such articles mischaracterized HPD policies, contained numerous misstatements of facts, and generally undermined community trust and respect in HPD. Regardless, Nixon's temporary suspension was based primarily on (and would have been justified based solely on) the articles that contained the aforementioned denigrating statements regarding the Houston citizenry.

view his comments deriding and insulting the community not as legitimate criticism of police practices but as a direct blow to the relationship with the community HPD serves, and HPD must be able to prohibit such speech if it is to perform its function and maintain its professionalism.

We thus find that under a Pickering analysis, Nixon's magazine articles are not protected under the First Amendment. In so concluding, we are mindful of the paramilitary structure of the police department and the greater latitude given their decisions regarding discipline and personnel regulations.

IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.