Terry ANDERSON, Plaintiff

v.

**TUPELO REGIONAL AIRPORT AUTHORITY, Defendant.**

**Civil Action No. 3:11–CV–131–M–A.**

United States District Court,
N.D. Mississippi,
Western Division.

Sept. 6, 2013.

Jim D. Waide, III, Rachel Pierce Waide, Waide & Associates, PA, Richard Shane McLaughlin, McLaughlin Law Firm, Tupelo, MS, for Plaintiff.

Timothy Michael Peeples, Silas W. McCharen, Stephen Paul Huwe, Daniel, Coker, Horton & Bell, Oxford, MS, John Samuel Hill, Mitchell, McNutt & Sams, Tupelo, MS, for Defendant.

## *ORDER*

MICHAEL P. MILLS, Chief Judge.

This cause comes before the court on the motion of defendant Tupelo Regional Airport Authority ("TRAA" or "the air-

port") for summary judgment, pursuant to Fed.R.Civ.P. 56. Plaintiff Terry Anderson has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is well taken and should be granted.

This is a First Amendment retaliation and age discrimination case in which plaintiff alleges that he was wrongly discharged from his position as Executive Director of the TRAA in 2009. Plaintiff was first hired for this position in 2000, when he was fifty-four years old. The Executive Director position required plaintiff to oversee the "safety operations and maintenance" at the airport, and, in performing this role, he answered directly to the TRAA's Board of Directors. In 2004, the Board of Directors, with plaintiff's assistance, began to study the issue of extending the runway at the Tupelo airport, and the issue remained unresolved five years later. The runway extension project became a significant public controversy, based largely upon the likelihood that it would require the closure of parts of West Jackson Street Extended, a major transportation and business artery in Tupelo. Plaintiff, acting in his capacity as Executive Director, participated in interviews and/or communicated with reporters at the *Northeast Mississippi Daily Journal* newspaper on several occasions about the runway extension project-In so doing, plaintiff consistently expressed his view that "the safest and most economical method of extending the runway involved relocating a portion of West Jackson."

Unlike plaintiff, certain members of the Board of Directors developed reservations about relocating West Jackson. Indeed, a November 2009 newspaper article reported that "board members voted last week to postpone action [on the runway project] in the wake of public discord" and that the

"project currently is on hold." The Board meeting in question occurred on November 10, 2009, and, the next day, plaintiff sent two e-mails to Daily Journal newspaper reporter Dennis Seid, in which he appeared to express frustration and disagreement with the Board's actions the previous day. The first of these e-mails was sent at 7:07 a.m. on November 11, and it states as follows:

Dennis,

Thank you for coming to the Board meeting last night. After a restless night, I think it might be appropriate to respond to certain questions if you might have some. Questions could be: consensus and whether unanimity is worth the economic growth of a region; is Tupelo Regional a Municipal airport; are we rushing the project; Do 19 responses, some favorable but all for extension, really represent a valid reason to risk project failure; and what are the dynamics of the West Jackson major thoroughfare?

Your call, but I think these are the basis of the issue and people need to use fact not innuendo in reaching a decision.

As always, thanks for your' concern,

Terry

Plaintiff's e-mail was written from his work account, and the signature line included his official title of Executive Director of the TRAA.

In response to plaintiff's invitation, Seid submitted a number of questions relating to the runway extension project, and plaintiff responded with a lengthy and spirited defense of it. This defense included apparent criticism of Board members who had raised questions about the project, including the following response to a question by Seid:

8. And what do you make of the comment that TUP is a municipal and NOT

a regional airport? Terminology-wise, does it make a difference?

[Plaintiff's response, in pertinent part:] This comment was made by a Board member who has been to only 9 out of 21 Board meetings in the past two years. Tupelo's airport by definition is a municipal airport because our sponsor is a single body politic. I believe that term was used to denigrate the value of the airport but that is my humble opinion. . . .

Plaintiff thus appeared to describe in disparaging terms the diligence of an unnamed Board member who had raised questions about the project.

The very next day, plaintiff sent e-mails to Board member Glenn McCullough in which he appeared to describe himself as supportive of the Board's policy-making authority and desirous of staying out of the "politics" of the matter. In one such e-mail, plaintiff wrote to McCullough that:

Glenn,

I completely respect your position and advise, I take my direction from the Board, in particular the Chairman. I would never compromise that relationship. There has been a significant change in the personality and complexion of the Board and the news is picking that up. It's well that I leave the politics to the body politic that is the appointed leadership.

Thanks,

Terry

Plaintiff thus appeared to foster the impression that he was well aware of the importance of the airport speaking with one voice on the issue of the runway project.

McCullough responded to plaintiff's e-mail as follows:

Good. 1 reason is this takes you out of the direct line of fire. There are other reasons we can discuss when time allows. I appreciate your work. Glenn

In his reply, plaintiff offered an unprompted assurance that he had not talked to the "DJ," winch all parties agree refers to the Daily Journal:

I've already declined two requests and directed the DJ to Board members. Your suggestion is appreciated.

Terry

Plaintiff did not mention the fact that, the previous day, he had sent an e-mail to Daily Journal reporter Seid in which, as noted previously, he appealed to question the Board's decision to place the runway extension project on hold.

Board member Larry Gibens testified that, after Seid's article appealed, he and other Board members questioned plaintiff regarding whether he was the source for the article. All parties appeal to agree that plaintiff responded that he was not. Gibens testified that he knew that plaintiff was lying and that he personally went to question Seid regarding his source, Seid produced the e-mails sent by plaintiff which, Gibens testified, confirmed in his mind that plaintiff had lied to the Board. Gibens testified that, based upon this and two other "lies" told by plaintiff to the Board, the decision was made to fire him. Only one Board member, Smitty Harris, voted to retain plaintiff. Harris, who had been the lone Board member who strongly supported plaintiff's efforts to promote the runway extension project, later resigned in protest over plaintiff's termination and has submitted an affidavit asserting that he regards the firing as unjustified.

Feeling aggrieved, plaintiff filed the instant lawsuit alleging that age discrimination and/or First Amendment retaliation were the real reasons behind his termination. Defendant has presently moved for summary judgment, contending that no

genuine issues of fact exist regarding plaintiff's claims and that it is entitled to judgment as a matter of law.

The court will first discuss plaintiff's ADEA claims, which it finds to be unsupported by either direct or circumstantial proof of age discrimination. In so concluding, the court initially notes that, while the parties agree that a "motivating factor" causation standard applies to plaintiff's First Amendment retaliation claims, the Supreme Court has made it clear that a "but for" causation standard applies in ADEA cases. *See Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). For the reasons discussed below, the court concludes that no genuine fact issues would exist regarding plaintiff's ADEA claims even under a "motivating factor" standard, but it sees no valid argument whatsoever that age was a "but for" cause of his termination.

Plaintiff explained the rationale behind his age discrimination claims in his deposition, testifying that:

I believe the Respondent wanted a young, inexperienced director who is not likely to give information about certain activities of airport board members to the media or to the public.

The court regards this as being a rather extraordinary admission by plaintiff. But for this testimony, the court might regard plaintiff's e-mail to Seid as an uncharacteristic breach of corporate protocol, resulting from emotion and frustration over the tabling of a runway project which he had so strongly supported. Plaintiff's deposition makes it clear, however, that he saw it as his duty to publicly air his grievances against certain Board members. This court offers no opinion regarding whether plaintiff's complaints against these Board members are valid, but it finds it unsurprising if an employee who campaigns against the people at whose pleasure he serves does not find himself long employed.

It seems to this court that, if an Executive Director wishes to campaign against Board members to whom he is answerable, then his prospects largely depend upon political factors. It may be that such an executive has a sufficiently strong standing with the shareholders that he can either secure the removal of the Board members of whom he disapproves or force a change in the Board's policy direction.[1] Plaintiff evidently did not enjoy a strong position in this regard, since he was fired soon after making the statements in question. Under these circumstances, plaintiff may not seek to transform his termination into an age discrimination claim when, as discussed below, his firing had nothing to do with his age. Moreover, as discussed below, plaintiff may not seek the protection of the First Amendment for statements he made in his capacity as Executive Director, since it offers no protection for statements made by individuals in their capacity as employees, rather than as private citizens.

As to plaintiff's age discrimination claim, the U.S. Supreme Court made it clear in *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) that the ADEA was enacted in reaction to ster-

---

1. In this case, the "shareholders" would appear to be the voters who elect the politicians who appoint the members of the Board. Plaintiff makes reference to "politics" determining the fate of the runway project, and it seems likely that he is correct in this regard. This should be unsurprising, considering that the project would have a substantial impact upon the City of Tupelo, including the re-routing of major roads used by many citizens and businesses. Accordingly, it does not strike this court as being either surprising or unseemly that the project would have become a political issue.

eotypical beliefs among some employers regarding the notion that an individual's competence and work performance decline with age. Specifically, the Supreme Court wrote as follows in *Hazen Paper*.

> It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age. As we explained in *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes. *Hazen Paper*, 507 U.S. at 610, 113 S.Ct. 1701.

 The Supreme Court in *Hazen Paper* thus emphasized that the ADEA was enacted to combat employment decisions made on the basis of certain specific stereotypical views regarding older workers' lack of competence. The Supreme Court hastened to add, however, that other factors which are merely "correlated" with age, such as pension status, may not serve as the basis for an ADEA claim, writing that:

> When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is.

*Id.* at 611, 113 S.Ct. 1701.

*Hazen Paper* represents a rather limited reading of the scope of the ADEA, but this court would not regard plaintiff's age discrimination claim as being viable under even the broadest reading of the statute. This court does not view the tendency of a particular employee to "give information about certain activities of airport board members to the media or to the public" as

even being a factor which is "correlated" with age. Indeed, one could just as easily argue that older workers nearing retirement would be less likely to "rock the boat" than younger workers, who are often viewed as being more iconoclastic and willing to "shake things up." This court is not suggesting that such is the case, but such an argument could just as easily be made as the one posited by plaintiff.

It seems self-evident that many, if not most, Board members would be disinclined to retain an Executive Director who publicly questions their policy decisions and subsequently provides false information about having done so, regardless of that executive's age. This conclusion is supported by the fact that plaintiff was fired in December 2009, shortly after he had made the statements in question and provided false information about having done so. To state the obvious, plaintiff did not suddenly become an older gentleman that month, and his age discrimination claim is thus not even supported by a temporal proximity argument.

Plaintiff notes that Board member Gibens had inquired on multiple occasions as to when he would retire, but Gibens responds that it was the Board's duty to have a succession plan in place in the event that plaintiff retired. Moreover, Gibens is actually older than plaintiff, which makes him a poor target for accusations of age-based animus. Plaintiff notes that he was replaced by a director who was only thirty-three years old, but defendant notes that it initially offered the position to a forty-six year old candidate, who declined the offer based on family considerations. The court finds this to be less than compelling evidence of age discrimination, and regardless, it largely only assists plaintiff in making his *prima facie* case of discrimination.

Defendant has chosen not to contest plaintiff's ability to make a *prima facie* case with regard to either his age discrimination or First Amendment retaliation claims, instead relying upon the strength of its stated lawful reasons for terminating him. Given that these stated reasons apply equally to both of plaintiff's claims, it seems appropriate to discuss them in tandem. In setting forth its lawful reasons for firing plaintiff, defendant cites three primary allegations of alleged dishonesty which, it contends, led to the Board's losing confidence in plaintiff and deciding to fire him:

> While there were other concerns about the plaintiff and his job performance, he was terminated for lying, which resulted in a loss of confidence with the Board. First, the plaintiff lied in response to questions about the phone system at the TRAA ... [telling] the Board, when asked, that he did not know who provided the phone service at the airport.... Second, the plaintiff lied about submitting information to the media regarding the runway extension issue. The Board directly asked the plaintiff if he had supplied a reporter at the *Daily Journal* some information for a news report, and the plaintiff said he had not. The Board was not concerned with the content of the plaintiffs email to the media for the story, but rather was concerned with the plaintiff lying about having sent the information. Finally, the plaintiff lied about being represented by counsel. Prior to denying that he was represented by an attorney, TRAA's Board had received correspondence from his current counsel, indicating that the plaintiff was his "client."

All three of these incidents occurred around the time of plaintiff's termination in December 2009, and the court will consider them in turn.

The first alleged incident of dishonesty, relating to plaintiff's knowledge regarding the provider of phone services, is seemingly somewhat innocuous on its face. It appears less so, however, when one considers the deposition testimony of Board members that the inadequacy of phone services had actually been one of the most contentious issues at the airport. In his deposition, McCullough testified that, after he was appointed to the Board, he interviewed airport employees to learn their impressions of what might be improved at the facility. McCullough testified that he spoke with one female employee who reported that the "telephones don't work" at the airport and that this fact was causing "huge problems."

In his deposition, Gibens similarly testified that the inadequacy of phone services at the airport was one of its most pressing problems. Gibens testified that he knew that plaintiff was "lying" when he professed lack of knowledge of the provider of phone services since he had "discussed the phone system with him numerous times." In fact, Gibens testified that the inadequacy of phone services was related to a potential conflict of interest whereby Chuck Moffatt, a previous TRAA Board chairman, was providing the allegedly defective phone services. In his deposition, Gibens testified as follows regarding this conflict:

> And then I said, Is there a conflict of interest with the chairman having the phone system?" Mr. Moffatt and Mr. Anderson had a quick meeting, came back out and said, "Let's make a resolution that Mr. Moffatt can donate the phone system," and I don't know what part of the system it was, "to the Tupelo Airport Authority," which he did. But he continued to service it at three hundred and something dollars a month.

Gibens thus testified that there were concerns that the defective phone services

were being provided as part of a "sweetheart deal" of sorts involving a former airport insider and that plaintiff was specifically aware of the suggestions of impropriety in this regard.[2]

Gibens testified that, in light of his extensive prior dealings with plaintiff on this issue, he regarded it as being something of a bombshell when, around the same time as plaintiff's alleged dishonesty regarding his dealings with the press came to light, he told the Board that he was unaware who provided phone services at the airport. In his deposition, Gibens testified that he knew plaintiff would have to be fired as soon as he so stated to the Board:

Q: When Mr. Anderson was asked at that board meeting who's handling the phone system, and he responded, "I don't know," you knew at that moment he was lying?

A: That's correct.

Q: Did you confront him at that time?

A: No.

Q: Why not?

A: Because to me, right then that was grounds for termination. I saw no reason to say anything.

Gibens was thus adamant that plaintiff's alleged dishonesty regarding the phone provider issue was one of the primary reasons for his termination.

In his deposition, McCullough similarly testified that he found plaintiff's assertion in this regard to be less than credible:

Q: Do you know or claim to know or have any evidence to suggest which was the case, did he honestly not know, or

did he just not—did he dishonestly answer the question.

A: Well, since the executive director of the airport has to sign the checks to pay for service, I have to believe that you would know who you pay the phone bill [sic]. Your phone service is provided by a certain provider, and I find it hard to believe that someone responsible for running an airport wouldn't know who provides the phone services.

A third Board member, Jim Ferrer, provided testimony regarding the phone service issue which was consistent with that of Gibens and McCullough.

The evidence thus strikes this court as being rather strong that Board members regarded plaintiff's professed lack of knowledge regarding the phone service provider as being an important factor in support of his termination. In response, plaintiff offers a defense which, even if accepted as true, does not advance his claims. That is, plaintiff asserts in his affidavit and brief that there were actually multiple providers of phone services at the airport, of which Moffatt's company was merely one. Plaintiff thus submits that there was "no simple answer to an inquiry regarding who provided the telephones" at the airport.

For the purpose of this lawsuit, plaintiff's argument misses the point. This is not a suit to determine whether plaintiff acted in a competent manner in responding to the Board's inquiry regarding the airport's phone service provider. Rather, the issue is whether Board members genuinely *perceived* that plaintiff's response demonstrated either a lack of competence

---

**2.** Plaintiff argues that defendant provides no reason as to why he would lie regarding his knowledge of who provided phone services at the airport. However, it appeals that defendant is suggesting that it may have been defensiveness regarding conflict of interest

issues that led plaintiff to be reluctant to concede that he had hired a former Board member who was providing what all parties appear to concede were substandard phone services.

or outright dishonesty on his part and that this perception, rather than unlawful discrimination or retaliation, motivated the decision to fire him. Plaintiff's argument goes to *his* subjective state of mind in providing what clearly appeals to be an inadequate response to the Board's inquiry and is thus largely irrelevant. The court therefore regards defendant's proof on this issue as being essentially unrebutted.

The court now turns to a second instance of alleged dishonesty on plaintiff's part which defendant cites in favor of his termination. This incident, which the court has previously referenced, involves what appears to be—at best—misleading information provided by plaintiff regarding whether he had been communicating with the press regarding the runway project. Unlike the phone provider issue, this incident does not require inquiry into extrinsic facts, but, rather, simply requires the court to compare and contrast e-mails which plaintiff wrote to McCullough and to Seid. This court has already quoted from these e-mails at length, and it will not do so again here. Suffice it to say, however, that it is very difficult for this court to reconcile plaintiff's e-mail to Seid with his assurances to McCullough, the very next day, regarding his loyalty and discretion regarding media matters.

In his brief, plaintiff offers a rather tortured explanation as to how his representations to McCullough and the Board regarding his media contacts were technically accurate. Even considering the deferential factual standard on summary judgment, these explanations are difficult to swallow. In his brief, plaintiff argues that he told McCullough "that he had declined two media requests and directed the media to the board members. This was true." However, plaintiff offers no explanation for his failure to mention that he had sent, the previous day, a lengthy e-mail to Seid which included criticisms of both the Board's decisions and the diligence of one of its members.

In asserting his good faith in this regard, plaintiff is confronted with the fact that he provided false information both in the e-mails to McCullough and also in response to queries from the Board. In his deposition, Gibens testified that, after the Daily Journal published an article based in part upon plaintiff's e-mail, the Board specifically asked plaintiff whether he was the source for the article. Gibens testified that plaintiff denied that he was:

A: The question was "Did you send this article"—"Did you send this article that appealed in the paper to them," and he said he did not.

Q: And by "article," you mean the information. He had given the paper the information.

A: He gave them the information. And like I said, the information wasn't the problem. The problem was all he had to say was "Yes, I sent it." And then we could have discussed whether we disagreed or agreed with him making the statement. But the fact is he said he didn't send it.

Q: So that was an instance of dishonesty by Mr. Anderson?

A: That's correct.

In light of this specific question directed to him, plaintiff's protestation that he had declined two media requests seems largely irrelevant. According to Gibens, the Board's question was whether plaintiff was the source of the Daily Journal's article, and he presumably knew that he was. Accordingly, plaintiff should have acknowledged this fact, and it seems quite likely that he was, in fact, deliberately seeking to mislead the Board in stating otherwise.

Plaintiff may have believed that Seid would treat him as a confidential source

and that the e-mails he sent to him would remain secret. If this was plaintiff's belief, then it was one which was quickly dispelled. Gibens testified that he went directly to Seid to inquire regarding his source for the article and that the reporter showed him the e-mails which plaintiff had sent.

This court has little difficulty in believing that, once it learned the true facts concerning plaintiff's press contacts, the Board would have genuinely lost confidence in plaintiff. Plaintiff's apparent dishonesty regarding his dealings with Seid do not involve a tangential aspect of his duties, but, rather, the fundamental nature of his relationship with his employer. It appears that plaintiff was falsely portraying himself as being a loyal team member who exercised discretion in dealing with the media, when his actions did not reflect such. The court therefore concludes that plaintiff has failed to rebut defendant's assertion that his false statements regarding his media contacts were one factor motivating his termination.

The court now turns to the third alleged incident of dishonesty involving plaintiff This incident involves plaintiffs denial to the Board that he had retained counsel to represent him when, the Board asserts, it was aware at the time that he had hired his present counsel, Jim Waide. Plaintiff does not deny that he had met with Waide at the time he made his representation, and defendant notes that Waide had referred to plaintiff as his "client" in correspondence with defense counsel.[3] Plaintiff asserts that no formal fee arrangement had been entered into with Waide at the time he denied having retained counsel,

and he thus argues that his denials to the Board were truthful. As with plaintiff's professed lack of knowledge regarding the airport's phone provider, the court concludes that the answer to this technical legal question is largely immaterial and that the real issue is whether the Board members genuinely *believed* that plaintiff had lied to them. At the time it fired plaintiff, the Board was not privy to his private agreements with his counsel (or lack thereof); it merely knew that an attorney had contacted them on plaintiff's behalf with regard to his job dispute. Under these circumstances, it seems entirely reasonable for defendant to have believed that plaintiff had been dishonest in denying having retained counsel. The court therefore concludes that this stated lawful reason for terminating plaintiff is unrebutted.

In light of the foregoing, the court accepts that all three of defendant's stated lawful reasons for terminating plaintiff actually factored into its decision to do so. As discussed below, however, the court finds less persuasive defendant's assertion that these three incidents of dishonesty were its sole reasons for firing plaintiff and that the actual content of his e-mails to Seid did not factor into the decision. Still, the content of this e-mail is only relevant to plaintiff's First Amendment claim, and given the court's previously-stated conclusion that plaintiff's evidence of age discrimination is very weak, it will grant defendant's motion to dismiss plaintiff's ADEA claims and concentrate solely upon plaintiff's First Amendment claim.

 In order to prevail on a First Amendment retaliation claim, a public em-

---

**3.** Plaintiff argues that the letter from Waide is inadmissible hearsay, but it seems clear to this court that the letter is being used not for the truth of the matter asserted (i.e. that plaintiff was Waide's client), but to show the recipient's knowledge and state of mind. Indeed, the issue of whether plaintiff was Waide's client at the time the letter was sent is largely irrelevant for the purposes of this lawsuit.

ployee must (1) suffer an adverse employment action, (2) establish that his speech involves a matter of public concern, (3) establish that his interest in commenting on matters of public concern outweigh any interest the employer has in promoting efficiency and (4) show that his speech motivated the employer's adverse action. *Teague v. City of Flower Mound, Tex.,* 179 F.3d 377, 380 (5th Cir.1999). If the employee establishes those four elements, "the burden shifts to defendants to show by a preponderance of the evidence that they would have come to the same conclusion in the absence of the protected conduct." *Beattie v. Madison Co. Sch. Dist.,* 254 F.3d 595, 601 (5th Cir.2001), *applying Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In the court's view, plaintiff does have some proof that the actual content of his e-mail to Seid, and not merely his having allegedly lied about it, was one motivating factor behind his termination. In particular, plaintiff cites the deposition testimony of one of five board members—Glenn McCullough—that plaintiff's having spoken with the media regarding policy matters properly reserved for the Board was one factor, among others, winch motivated his decision to vote to fire him. Specifically, McCullough testified that:

Q: [T]he communications to the media, did they have anything to do with you losing confidence?

A: I felt that the chairman of the authority should be the spokesman on policy decisions. The airport authority is responsible for policy. We covered that in prior testimony. That was not the reason that I totally lost confidence. There were other factors.

Defendant appeals to acknowledge that McCullough's testimony is problematic for its case, and it emphasizes Gibens' testimony that the Board only considered the fact that plaintiff had lied about having talked to the media, and not the content of his communications. Specifically, defendant argues that:

A review of Mr. McCullough's testimony reveals only that he considered the plaintiff's contact with the media in formulating his own personal opinions, but it does not come close to establishing that the substance of the plaintiff's communications with the media led to Mr. McCullough's decision or to the Board's decision as a whole. The reason for the plaintiff's termination was not the substance of what he said. Instead, the reason for his termination is that he lied about having engaged in a discussion with the media about the runway extension issue (and other issues) to the Board. As Mr. Gibens explained, "the information wasn't the problem. The problem was all he had to say was. 'Yes, I sent it.' And then we could have discussed whether we disagreed or agreed with him making the statement. But the fact is he said he didn't send it."

Gibens thus maintained that the Board only considered plaintiff's dishonesty regarding his statements without even getting to their content. However, this court has some doubts regarding whether this is how the human mind, and human nature, works.

At the time the decision was made to fire plaintiff, Gibens had already read the e-mail he sent to Seid. Accordingly, Gibens was aware not only of the fact that plaintiff had misled the Board about being the source for Seid's article but also the fact that he had sent an e-mail to the media which was critical of both the policy direction, and, to some extent, the basic diligence of the Board. Moreover, the tone of plaintiff's e-mail, including its statement that it was only sent following a

"restless night," is suggestive of an Executive Director who was publicly questioning the Board's direction out of emotion and frustration. McCullough candidly admitted that the fact that plaintiff had chosen to speak out on policy matters bothered him, and it strikes the court that the actual content of the e-mail sent by plaintiff to Seid would have been bothersome to many Board members in his position. Indeed, as noted previously, plaintiff himself appeared to acknowledge in his deposition that he had "give[n] information about certain activities of airport board members to the media or to the public," and this suggests that the relationship between plaintiff and certain Board members was, at the very least, seriously strained. Accordingly, the court suspects that McCullough may have simply been more candid than Gibens in noting his dis-satisfaction with the content of plaintiff's e-mail.

The court does not, for the reasons previously discussed, doubt that plaintiff's apparent dishonesty with regard to the three matters raised by defendant played an important role in the decision to fire him. At the same time, it seems more than plausible that the content of plaintiff's e-mail would have also played a role in the decision, and McCullough confirmed that such was the case, at least from his perspective. Defendant argues that it would have fired plaintiff for lying regardless of the content of his e-mails and that it should prevail under *Mt. Healthy's* "same decision" defense regardless. While defendant has a valid argument in this regard, fact disputes of this nature are, as a general matter, best resolved by a jury.[4] The court would likely conclude that such was the

case with regard to plaintiff's First Amendment retaliation claim, if this claim were otherwise legally sound. As discussed below, however, it is not.

■■■■ While the court concludes that plaintiff has established fact issues regarding whether he was fired at least partly based on the content of his e-mail to Seid, this fact is largely irrelevant since, in sending that e-mail, he was speaking as an Executive Director, and not as a private citizen. Under the U.S. Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), for an employee's speech to be protected by the First Amendment, he must be speaking as a citizen on a matter of public concern.. "An employee is not speaking as a citizen—but rather in his role as an employee—when he 'makes statements pursuant to his official duties.'" *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir.2007) (*quoting Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). Activities required by one's position or undertaken in the course of performing one's jobs are activities pursuant to official duties. *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir.2007).

In arguing that he was speaking to the Daily Journal as a private citizen, plaintiff emphasizes McCullough's testimony that policy matters at the airport were dealt with by the Board and that plaintiff's job merely involved the day-to-day operations of the airport. In response, defendant persuasively argues that, while this may be true, plaintiff was expected to act as the public face and "mouthpiece" for the air-

---

4. This court's conclusion in this regard is strengthened by the fact that, as noted by plaintiff, some of the Board members raised various other grievances against him in justifying their votes in favor of termination. Given that a mere "motivating factor" causation

standard applies to plaintiff's First Amendment claims, this fact would militate in favor of allowing a jury to decide these causation issues, if plaintiff's First Amendment claim were not otherwise legally deficient (which it is).

port. In this context, Gibens testified in his deposition that:

> He was executive director of the airport. In my opinion, well, in the opinion, I think—he was our mouthpiece, yes. He was supposed to make statements as long as his statements—we didn't need surprises.

Indeed, Gibens suggested that plaintiff had not only been willing, but eager, to speak to the media, and a simple internet search reveals a number of news articles in winch plaintiff had spoken to the media in his capacity as Executive Director, regarding various issues affecting the airport.

The court frankly doubts that plaintiff could have ever spoken as a private citizen to the media regarding the runway extension project. Indeed, it seems clear that Seid was interested in plaintiff's views on the subject precisely because he was Executive Director of the airport. Moreover, while plaintiff touts his knowledge and expertise of the project resulting from years of studying it, it is clear that he had that expertise precisely because defendant had paid him to study it, on its behalf. Defendant emphasizes that it paid plaintiff to study the issue so that he could advise it regarding the project, and it certainly did not do so in order that he could wage a clandestine media campaign against it once it reached a policy decision not to his liking. If plaintiff had spoken to the media regarding, say, his preference in the presidential election, and defendant had fired him on that basis, then he would likely have strong First Amendment claims. In such a scenario, plaintiff would have truly been speaking as a private citizen regarding a matter of public concern. Under the facts of this case, however, plaintiff was speaking regarding a matter as to which he had expertise solely based upon his job duties, and he was speaking to the media just as he had done on a number of prior occasions in his capacity as Executive Director.

The court notes that there are things that plaintiff could have done differently if he had wished to even give himself an arguable position that he was speaking as a private citizen regarding the runway project. For example, plaintiff could have e-mailed Seid from his personal e-mail account, and he could have made it clear that he was seeking to offer his views as a private citizen. Plaintiff could also have emphasized that his comments were only intended to offer Seid background information regarding the project and that they were not intended for publication. Even with these precautions, the court would likely still conclude that plaintiff was speaking as Executive Director, for the reasons previously stated. As the record presently stands, however, plaintiff has given this court a very easy call, since he took none of these precautions. Rather, plaintiff simply e-mailed Seid from his official work e-mail account with his official title of "Executive Director" in the signature, and he gave Seid no indication that he was purporting to speak as a private citizen. Under these circumstances, the evidence is overwhelming that plaintiff was speaking in his official capacity as Executive Director in his e-mail to Seid.

The court also notes that the Fifth Circuit has held that plaintiffs were speaking as employees, rather than private citizens, under circumstances which are far less official than those in this case. In *Nixon v. City of Houston*, 511 F.3d 494 (5th Cir.2007), for example, the Fifth Circuit upheld the termination of a Houston police officer, finding that media appearances and articles written by him were not protected by the First Amendment under *Garcetti*. In *Nixon*, the Fifth Circuit described the circumstances surrounding the police officer's statements to the media as follows:

On January 18, 2006, there was a highly publicized high-speed police pursuit involving state and local law enforcement officers, including HPD officers, and a fleeing suspect. After the fleeing suspect had been identified, HPD supervisors ordered all HPD officers to discontinue the pursuit but permitted them to follow at a distance. Nonetheless, the fleeing suspect eventually collided with an innocent motorist. Although Nixon was not involved in the pursuit, he knew about it from local television reports he saw while he was off-duty, at home, and preparing for his shift.

As soon as his shift started, Nixon proceeded to the scene of the accident-even though he was never instructed to do so. Upon arriving, Nixon asked a supervisor if anyone was going to make a statement to the media and suggested that he (Nixon) do so. After the supervisor failed to respond (other than by laughing), Nixon proceeded to speak to the media. Nixon, however, was not designated as an HPD spokesperson and was not authorized to make statements to the media at the scene. In his statement, Nixon criticized HPD's decision to disengage the pursuit and stated he was "embarrassed to be a police officer" because the department did not stop fleeing suspects.

The next day, on January 19, 2006, Nixon continued his criticism of HPD and its pursuit policy by voluntarily calling into multiple radio talk shows and by giving television interviews. After his remarks on both days, Nixon informed the HPD media relations office that he had spoken to the media, presumably in an attempt to comply with his employer's media policy.

*Nixon,* 511 F.3d at 496–97.

*Nixon* appeals to involve a fact pattern where a police officer was ad-libbing and "hamming it up" before the media as a self-appointed police spokesman, even though he had not even participated in the high-speed chase regarding which he saw fit to publicly comment. Moreover, unlike plaintiff, speaking to the media was something which the police officer in *Nixon* did not customarily do. *Id.* Even under this fact pattern, the Fifth Circuit found that the officer in *Nixon* had spoken pursuant to his official duties within the meaning of *Garcetti. Nixon,* 511 F.3d at 496–497. In so concluding, the Fifth Circuit wrote that:

> it is clear that Nixon's January 18, 2006 media statement at the scene of the accident is not protected by the First Amendment because it was made pursuant to his official duties and during the course of performing his job. Nixon spoke to the media while on duty, in uniform, and while working at the scene of the accident.

*Id.* at 498.

Plaintiff's communications to the media in this case strike the court as being far more official than those of the police officer in *Nixon,* and it is therefore difficult to discern how this court might reach a different result in this case. Indeed, the Fifth Circuit noted in *Nixon* that

> The fact that Nixon's statement was unauthorized by HPD and that speaking to the press was not part of his regular job duties is not dispositive-Nixon's statement was made while he was performing his job, and the fact that Nixon performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors does not convert his statement at the accident scene into protected citizen speech.

*Id.* In the court's view, there is no way to reconcile this holding with plaintiff's argument that he was speaking as a private

citizen in this case. Plaintiff was not merely a low-level police officer, but rather the Executive Director of the airport. Moreover, the facts that plaintiff communicated via his official work account, and with his official title in the signature, clearly support a conclusion that he was speaking in his official work capacity. This court can discern no coherent argument to the contrary, even if McCullough believed that plaintiff had exceeded the scope of his proper duties as spokesman. Plaintiff's e-mails to McCullough suggest that he himself knew that he had spoken out of turn, but this does not mean that he spoke as a private citizen in doing so. The court therefore concludes that, much like the police officer in *Nixon,* plaintiff was speaking inappropriately as an employee in this case, rather than as a private citizen, and recovery in this case is thus similarly barred.

■ *Nixon* appears to be based partly upon a conclusion that employees should not be rewarded for exceeding the scope of their proper duties in speaking to the media. That is essentially what plaintiff is seeking in this ·case: to be rewarded for speaking out of turn. Plaintiff relies upon McCullough's deposition for much of his case, but even this Board member seemed to agree that plaintiff could properly comment to the media regarding day-to-day operations at the airport that did not implicate public policy. Plaintiff himself advances similar arguments in his brief. Plaintiff's argument appears to be that, the moment he "crossed the line" and commented regarding policy matters which were best left to the Board, *Garcetti's* bar disappeared and recovery became available to him. This argument clearly lacks merit.

Generally speaking, the law seeks to restrict, not expand, an individual's legal remedies when they act in a manner which they know to be improper. Once again, the Fifth Circuit held in *Nixon* that the fact that an employee spoke "in an unauthorized manner, or in contravention of the wishes of his superiors does not convert his statement ... into protected citizen speech." *Id.* This holding is fatal to plaintiff's First Amendment claim in this case. *Nixon* makes it clear that Fifth Circuit law does not permit an anomalous result whereby an employee properly performing his job has no potential First Amendment claim, but one improperly performing his duties does. It should be readily apparent that this holding is supported by strong public policy considerations.

■ This court would finally note that, even assuming that *Garcetti* and *Nixon* are somehow inapplicable and that plaintiff could be found to have been speaking as a private citizen, his recovery would still be barred under the facts of this case. If a court determines that an employee is not speaking in his/her role as an employee, but rather as a citizen on a matter of public concern, "the possibility of a First Amendment claim arises." *Garcetti,* 126 S.Ct. at 1958. To determine whether the First Amendment protects the employee's speech, a court proceeds to the balancing test established by the U.S. Supreme Court in *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The *Pickering* test inquires regarding whether the interest of the government employer "in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interests, as a citizen, "in commenting upon matters of public concern." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.

■ The court is hesitant to even address the *Pickering* balancing test, since it seems abundantly clear that plaintiff was speaking as Executive Director in

this case. Assuming that plaintiff could somehow be understood to have spoken as a private citizen, however, the court would conclude that his own words provide the strongest evidence against any argument that the *Pickering* balancing test supports his claims. Relevant factors in the *Pickering* balancing test are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). As to these factors, the court would simply reiterate plaintiffs own words, in his e-mail to McCullough that:

> Glenn,
>
> I completely respect your position and advice. I take my direction from the Board, in particular the Chairman. I would never compromise that relationship. There has been a significant change in the personality and complexion of the Board and the news is picking that up. It's well that I leave the politics to the body politic that is the appointed leadership.
>
> Thanks,
>
> Terry

Plaintiff thus clearly acknowledged that publicly casting doubt upon the policy decisions of the Board would "compromise" the relationship between himself and the Board of Directors, and this concession goes to the very heart of the *Pickering* balancing test. Indeed, the harm to these working relationships is particularly acute in this case, considering that plaintiff cast doubt not only upon the wisdom of the Board's policy decisions, but the fundamental diligence of one of its members.

Once again, plaintiff made it clear in his deposition that this was intentional and that he saw it as his role to draw public attention to what he regarded as the failings of the Board members at whose pleasure he served.

Against tins acknowledged threat to effective working relationships at the airport, this court sees no compelling public interest which was served by the disclosures in plaintiff's e-mail to Seid. Indeed, it seems to this court that the controversy involving the runway project was one about which reasonable minds might disagree and that plaintiff was simply offering his own opinions in his e-mails to Seid. Plaintiff clearly has strongly held beliefs that the runway project was a beneficial one, but four of the five Board members with actual responsibility over policy matters clearly had reservations about the project. In considering whether plaintiff's alleged exercise of his First Amendment rights would outweigh the evident harm to working relationships at the airport, the court also deems it proper to give some consideration to the less than upfront manner in which he spoke out in this case. If plaintiff was participating in the "marketplace of ideas" in this case, then it seems clear that he was operating on the black market. That is, plaintiff communicated surreptitiously with a reporter while essentially lying to his employer regarding his having done so and, indeed, falsely portraying himself as a "team player" in this regard.

This court is not suggesting the confidential leaks to a newspaper should enjoy no First Amendment protection, but the right to free speech is one of the most exalted constitutional protections, and the manner in which plaintiff chose to speak out in this case strikes this court as being far from exalted. Indeed, as noted previously, plaintiff himself appeared to concede

in his e-mail to McCullough that it would be improper for him to question the Board's policy decisions in the manner which he did. It does not seem improper for this court to consider this fact in deciding whether plaintiff's speech in this case outweighs the harm which he himself conceded it would cause to working relationships at the airport.

As a final point, this court would submit that allowing plaintiff to recover under the facts of this case would establish a dangerous precedent in other First Amendment cases. In this court's experience, the most common context in which First Amendment retaliation cases arise in this district is in the situation where an individual is elected to a certain local governmental position, only to find himself presiding over an office where many of his new employees may have supported another candidate. In this context, the Fifth Circuit has repeatedly reiterated, most recently in *Mooney v. Lafayette County School Dist.*, 538 Fed.Appx. 447, 2013 WL 4018662 (5th Cir. 2013), that "a nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job that [s]he is satisfactorily performing upon the sole ground of h[er] political beliefs."

While the First Amendment rightly places limitations upon employers in this context, it seems proper that the law place limitations upon employees as well, and *Garcetti* plainly indicates that it does. While the First Amendment provides protection for employees against being fired based on their outside political beliefs and activities, it also seems proper that, barring unusual circumstances not present here, employees be expected to "play for the home team." If this court were to allow plaintiff to recover under the facts of this case, this result would likely give comfort to other local governmental employees who may oppose the political views of their bosses that they could use the First Amendment as a shield while they actively worked to frustrate the objectives of their employer, such as through confidential "leaks" to local media. This would likely have a seriously disruptive effect upon the working relationships at these local governmental entities. The court thus concludes that allowing plaintiff to assert First Amendment claims under the facts of this case would be contrary to considerations of both law and public policy. The court has previously concluded that plaintiff's age discrimination claims lack merit, and defendant's motion for summary judgment is therefore due to be granted, in its entirety.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered this date, pursuant to Fed.R.Civ.P. 58.

### *JUDGMENT*

For the reasons given in the court's order entered this date, it is hereby ordered and adjudged that this case is dismissed.