# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00497-CV

**Edwin K. Lang, Appellant**

**v.**

**Texas Department of Public Safety and
Steven C. McCraw, Director of Texas Dept. of Public Safety, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. D-1-GN-10-004145, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an administrative appeal from an order of the Texas Public Safety Commission (the Commission) affirming the discharge of Edwin Keith Lang from his job as a highway patrolman for the Department of Public Safety of the State of Texas (DPS). The Commission issued its order after hearing evidence that Lang had falsely documented DWI arrests he had never made, generated fictitious offense reports, and even admitted to this and other professional misconduct. Lang complains only of asserted procedural irregularities in the DPS processes leading to his discharge and that both DPS and the Commission acted arbitrarily and capriciously. The district court affirmed the Commission's order. Likewise finding no reversible error, we affirm the district court's judgment.

**BACKGROUND**

**Regulatory context**

Because the underlying dispute centers on the regulations and procedures governing employment and discharge of DPS officers, it is helpful to begin by briefly noting some basic features of that regime. In Chapter 411 of the Government Code—the chief provisions governing DPS and its oversight body, the Commission[1]—the Legislature has delegated to the DPS Director—the agency's chief executive officer[2]—power to "appoint, promote, reduce, suspend, or discharge any officer or employee of the department," subject to limitations that include a merit-based hiring and promotion system and discharge solely for "just cause."[3] Any discharge of a DPS officer, as well as any suspension or demotion of one, must be "for the violation of a specific commission rule," and "[i]f the department discharges, suspends, or demotes the officer, the department shall deliver to the officer a written statement giving the reasons for the action taken [that] must point out each commission rule alleged to have been violated by the officer and must describe the alleged acts of the officer that the department contends are in violation of the commission rules."[4] Although the Director determines in the first instance "whether an officer or employee is to be discharged,"[5] Chapter 411 authorizes a DPS officer to appeal any discharge to the Commission, which shall conduct "a public hearing" and either affirm or set aside the discharge

---

[1] *See generally* Tex. Gov't Code §§ 411.001-.422. In the absence of a material intervening substantive change, we cite to the current versions of relevant statutes and rules.

[2] *See id*. §§ 411.005, .006.

[3] *Id*. § 411.007.

[4] *Id*. § 411.007(e-1).

[5] *See id*. § 411.007(e).

"on the basis of the evidence presented."[6] "If the commission affirms the discharge, the discharged officer may seek judicial review . . . in a district court under the substantial evidence standard of review,"[7] i.e., the familiar rational-basis standard codified in section 2001.174 of the Administrative Procedure Act (APA).[8]

In addition to the limitations and requirements prescribed within Chapter 411, DPS officers are also protected by Subchapter B of Government Code Chapter 614,[9] which imposes notice requirements regarding "complaints" made against certain law enforcement officers and fire fighters.[10] Subchapter B provides that no "complaint" can be "considered by the head of a state agency" unless it is in writing and signed by "the person making the complaint."[11] A copy of this signed complaint must also be given to the subject officer "within a reasonable time after the complaint is filed" and "[d]isciplinary action may not be taken against the officer . . . unless a copy of the signed complaint is given to the officer."[12] Furthermore, the officer cannot be terminated or indefinitely suspended based on the subject matter of the "complaint" unless "the complaint is investigated" and "there is evidence to prove the allegation of misconduct."[13]

---

[6] *Id*. § 411.007(d), (f).

[7] *Id*. § 411.007(f).

[8] *See id*. § 2001.174.

[9] *See id*. § 614.021(a)(1).

[10] *See id*. §§ 614.021-.023.

[11] *Id*. § 614.022.

[12] *Id*. § 614.023(a), (b).

[13] *Id*. § 614.023(c).

Finally, in addition to these statutory requirements and protections, Chapter 411 directs the Commission to "establish necessary policies and procedures for the appointment, promotion, reduction, suspension, and discharge of all [DPS] employees,"[14] "procedures and practices governing the appeal of a disciplinary action [i.e., discharge, suspension, or demotion] within [DPS],"[15] and a "system to promptly and efficiently act on complaints filed with [DPS]."[16] Accordingly, the Commission has promulgated rules that include a "Personnel Complaint Policy" requiring that any "complaint" (defined therein as any allegation against a DPS employee of an illegal act or "infraction of department rules, regulations, or policies") initiated either by fellow DPS personnel or outside the agency must be in writing and signed in accordance with Subchapter B of Government Code Chapter 614, and mandating that "[a]ll written complaints filed with the department will be investigated thoroughly, objectively, and expeditiously."[17] Additional detailed procedures regarding DPS's complaint investigation, resolution, and appeals are prescribed in a portion of the DPS General Manual styled the "Texas Department of Public Safety Complaint and Administrative Hearings and Review Procedures" (the Procedures), which is also cross-referenced in the "Personnel Complaint Policy" rule.[18] We will explore the Procedures in more detail as they become relevant to our analysis, but it is worth noting initially that they distinguish between a

---

[14] *Id*. § 411.007(e-2).

[15] *Id*. § 411.0072(b); *see id*. § 411.0072(a)(1) (defining "disciplinary action" for purposes of that section).

[16] *See id*. § 411.0195.

[17] *See* 37 Tex. Admin. Code § 1.38 (2014) (Tex. Dep't of Pub. Safety, Personnel Complaint Policy).

[18] *See id*. § 1.38(e)(1).

"complaint" against a DPS employee—which must be in writing on a prescribed "C-1" form; triggers notice requirements consistent with Subchapter B of Government Code Chapter 614; and entitles the employee to an opportunity to respond[19]—versus an "administrative inquiry" regarding a DPS employee. While the Procedures provide that an "administrative inquiry" is investigated in much the same manner as a "complaint" and may lead to the filing of a "complaint" by DPS personnel, they do not require that the subject employee be given notice of or an opportunity to respond to the "administrative inquiry" itself.[20] However, the Procedures do require that any disciplinary action based on the subject matter of the inquiry must be preceded by a written "complaint" that is served on the employee (consistent with Subchapter B) and to which the employee has the opportunity to respond.[21]

**The challenged discharge**

The evidence presented to the Commission includes the following historical and procedural facts, which were largely undisputed. Although Lang had served with other law-enforcement agencies previously, his career with DPS began in 2002, when he entered the DPS academy. Following graduation, beginning in early 2003, Lang was assigned to serve as an officer with DPS's Highway Patrol Division and was stationed at locations in East Texas. Between 2003 and 2007, Lang garnered several awards that heralded, at least in part, high productivity in the number of DWI arrests with which he had been credited.

---

[19] *See* DPS Compl. & Admin. Hearings & Review Proc. (Procedures) § 42.02.

[20] *See id.* § 42.04.

[21] *See id.* § 42.04(11)(c), (g), (h).

Lang pursued promotional opportunities and, in early 2008, he progressed sufficiently far in the merit-selection process for a sergeant position that a background check was performed on him. This background check, fatefully, raised concerns regarding the accuracy of required documentation Lang had submitted in connection with the DWI arrests with which he had been credited previously. When making a DWI arrest, Lang and fellow highway patrol officers were required to submit a copy of the arrest citation (known as a "Form THP-6") and note the arrest on a "weekly report" ("Form HP-2"), essentially a diary or log on which they represented the number and use of their hours on duty. It was from these reports that DPS derived statistics concerning each officer's activities or output, including the number of DWI arrests each executed, for use by superiors. But in addition to submitting these reports in connection with an arrest, officers were responsible for preparing a detailed offense report (known as a "case report," or "Form THP-1") for use by local prosecutors, and similarly securing any evidence gathered incident to the arrest and, in the case of drug arrests, forwarding the potential contraband to a DPS lab for testing. The concerns raised by Lang's background check related to discrepancies between the number of DWI arrests Lang had reported through arrest citations and weekly reports and the apparent absence of case reports that would have been expected to correspond to the arrests. Relatedly, an investigator uncovered perceived indications that Lang had credited himself with making two DWI arrests where officers with other law-enforcement agencies had actually done the work. Ultimately, in July 2008, DPS authorized an internal investigation "into allegations of misconduct . . . concern[ing] DWI arrests claimed by Trooper Lang, but actually arrested by other officers." The investigation was styled as an "administrative inquiry," given the number "A.I.08-107," and assigned to Sergeant Robert Strickland, who specialized in DPS internal investigations.

6

Strickland did not commence his investigation of Lang until November of that year, citing a large volume of other investigations that had been assigned to him. Once Strickland began work, he examined arrest citations, weekly reports, and similar primary documentation Lang had generated regarding his law-enforcement activities and compared the facts Lang had represented against external verifiers, including case reports (if any existed), jail records, information from local prosecutors, and Lang's own dash-cam videos and computer records. Strickland also obtained a three-page affidavit from Lang dated November 17, 2008, followed by two much lengthier transcribed interviews (whose accuracy was later sworn to by Lang) dated November 24 and 25.[22] Strickland pursued five areas of inquiry:

- Strickland ascertained that in two instances where Lang had assisted officers of other agencies with investigations that ultimately yielded DWI arrests, he had claimed to DPS that he had made the arrests, yet it had been the other officers that had physically transported the defendants to jail and later prepared the offense reports. When confronted with these facts, Lang suggested that the discrepancies stemmed from misunderstandings regarding which officer was to prepare the offense reports, and insisted that "I did not claim these arrests to pad my stats."

- Strickland ascertained that in sixteen instances where Lang had turned in arrest citations and/or weekly reports reflecting a DWI arrest he had made, there was no corresponding case report or other external documentation that could confirm the veracity of that claim. To the

[22] The Procedures required that any DPS employee involved in an administrative inquiry investigation "fully cooperate and answer truthfully any and all questions asked by the investigator . . . in statement form and under oath." *Id*. § 42.04(11). In the event such questioning "involves allegations that could be criminal in nature," the Procedures further required that the employee "should be advised that since they are required to fully cooperate and answer all questions posed by the investigator, information obtained from the employee is information which the courts have held is not admissible[] against that individual in a criminal prosecution arising out of the same set of facts . . . in accordance with the Supreme Court decision in the case of Garrity v. State of New Jersey." *Id*. § 42.04(7)(b); *see Garrity v. New Jersey*, 385 U.S. 493, 496-500 (1967). The record includes a copy of a written "*Garrity* warning" signed by Lang a few minutes before the November 24 interview began. Additionally, at the outset of both the November 24 and 25 interviews, Lang acknowledged that he had been administered the warning and understood it.

7

contrary, Strickland concluded, dash-cam videos and other evidence revealed that some of the supposed DWI arrests had actually involved different underlying events (e.g., arrests for drug possession). When confronted with this evidence, Lang ultimately admitted that in four of these instances, he had "lied" or "fabricated" a DWI arrest that had never occurred.

• Strickland determined that in early 2006, Lang's immediate supervisor had noticed that the number of completed case reports Lang had turned in was lagging behind his DWI arrest statistics and ordered him to catch up. Lang's response, Strickland ascertained, was merely to copy and revise eleven case reports he had previously submitted in 2003 or 2004 and had stored on his computer, changing only the indicated dates to 2005 or 2006 instead and passing off these otherwise exact duplicates of the old reports to his supervisor as the reports corresponding to his DWI arrest statistics.[23] Strickland was able to confirm Lang's conduct with side-by-side comparisons of the corresponding duplicate and original reports, as well as records from Lang's computer. When confronted with this evidence, Lang admitted that he had "lied" and "fabricated" these eleven reports to the extent they purported to reflect events in 2005 or 2006.

• Strickland determined that on at least six occasions, Lang had failed to complete case reports relating to drug-crime arrests and/or to preserve such evidence and forward it to the DPS labs for testing, resulting ultimately in dismissal of charges. Lang did not dispute these occurrences, and even admitted that he had occasionally discovered misplaced contraband in his vehicle and simply thrown it in the trash. However, Lang denied that he had used or disposed of the drugs for his own benefit, attributing the events to his mistakes, sloppiness, or bad judgment.

• Strickland identified wide variances between the times Lang had indicated on warning tickets he had issued and the times indicated on the corresponding entries in his weekly reports. Strickland perceived this to be evidence that Lang had possibly been "shifting" the times of these warnings in order to conceal periods of inactivity while on duty. While admitting that he had merely "guestimated" the timing of his warnings when completing his weekly reports, Lang denied any attempt to deceive his superiors.

Based on the results of Strickland's investigation, a formal written complaint (per the Procedures, on a C-1 form), signed by Lieutenant Tim Smith (the same officer who had originally

---

[23] Lang submitted copies of these duped-and-revised case reports only to his supervisor and did not forward copies to local prosecutors. The supervisor did not initially detect Lang's subterfuge, evidently ending his inquiry upon being satisfied that Lang's case report numbers now matched his arrest statistics without also examining the reports' contents.

requested the investigation), was filed on December 5, 2008. The complaint was assigned the number "C08-154," and alleged the following:

> Allegation 1: On various dates and at various times between January 1, 2005 and December 31, 2006, it is alleged that Trooper Edwin Keith Lang fabricated information entered on case reports (Form THP-1).

> Allegation 2: On various dates and at various times between January 1, 2005 and December 31, 2006, it is alleged that Trooper Edwin Keith Lang fabricated and/or falsified information entered on arrest citations (Form THP-6) claiming DWI charges when no DWI arrests occurred and corresponding information pertaining to those citations he reported on his weekly reports (Form HP-2).

> Allegation 3: On various dates and at various times between January 1, 2005 and December 31, 2006, it is alleged that Trooper Edwin Keith Lang falsified information entered on written warnings (Form HP-3) and corresponding information pertaining to those warnings he reported on his weekly reports (Form HP-2).

> Allegation 4: On various dates and at various times between January 1, 2005 and December 31, 2006, it is alleged that Trooper Edwin Keith Lang failed to submit contraband (drug evidence) that came into his possession to a crime laboratory for analysis and/or destruction.

> Allegation 5: On various dates and at various times between January 1, 2005 and December 31, 2006, it is alleged that Trooper Edwin Keith Lang, failed to prepare and submit case reports and additional reporting documents in accordance with Departmental policy for custodial arrests.

The complaint further advised Lang that "[i]f the above allegations prove to be true," the conduct would violate Commission rules that included the following:

- "General Manual, Chapter 5, Section 05.56.00, Departmental Records[,] which states[,] 'Members of the Department shall submit all required reports on time and in accordance with established departmental procedures. Reports submitted shall be truthful and complete, and no member shall knowingly enter or cause to be entered any inaccurate, false, or improper information. Employees reporting false information shall be subject to severe disciplinary action.'"

9

- "General Manual, Chapter 5, Section 05.10.00, Compliance with Law, which states[,] 'Members of the Department of Public Safety are expected to be an example to the public in abiding by all laws of the United States, this state, and local jurisdictions.' To wit: Penal Code, Sec. 37.10(a)(1), Tampering with Governmental Record."

- "General Manual, Chapter 20, Section 20.10.00, Evidence Submitted To A Crime Laboratory, which states[,] 'It is the policy of the Department that all controlled substances and dangerous drugs that come into a DPS officer's possession, for any reason, be submitted to a crime laboratory for analysis and/or destruction. The one exception to this is that some excess quantities of drugs, and certain hazardous chemicals seized in clandestine drug laboratories, may be summarily destroyed.[']"

Lang was served with the complaint on the same day it was filed. As part of the prescribed investigation of the complaint, the Procedures required Strickland to obtain an interview and sworn statement from Lang,[24] but Lang executed affidavits adopting his prior statement and interviews "regarding AI-08-107 . . . [to] stand [on] its own . . . regarding C08-154." The Procedures further entitled Lang to submit a written response to the complaint within five business days after filing.[25] Although Lang, through counsel, complained of the "narrow" response deadline and the breadth of the allegations against him, he timely filed a nineteen-page written response to the allegations, referencing and incorporating portions of his November 17, 2008 affidavit and his two transcribed interviews. He also presented evidence of past favorable performance evaluations and several letters of commendation or support from various local judges, lawyers, and public officials. However, while attempting to portray them as favorably as he could, Lang did not retract his prior admissions of professional misconduct.[26]

---

[24] Procedures § 42.04(7)(a)(1), (2).

[25] *Id*. §§ 42.02(4)(a), .04(7)(a)(3).

[26] Regarding Allegation 1 (fabricated case reports), for example, Lang "acknowledge[d] his error in judgment . . . and request[ed] the reviewing officers to take into account all the

In February 2009, Strickland submitted to his superiors a sixty-six-page report detailing the evidence relevant to each allegation and recommending that all allegations except Allegation 3 (falsified information relating to warnings) be sustained.[27] He attached exhibits that included Lang's prior affidavit and statements; the aforementioned evidence Strickland had compiled to demonstrate Lang's misconduct; affidavits or sworn statements from twenty-two other witnesses; and Lang's performance evaluations, appreciation letters, and promotional history. The report was reviewed up through the chain of command, which concurred with Strickland's recommendations except for concluding that Lang had actually admitted to Allegation 3 also. Ultimately, in March 2009, the DPS Director (then Col. Stanley Clark) suspended Lang with pay until further notice "based upon the allegations enumerated in the formal complaint #C08-154." Following an intervening leadership change at DPS, the newly appointed Director, Col. Steven C. McCraw, served Lang written notice on September 4, 2009, that he had preliminarily found just cause for termination. In support, McCraw cited five "counts" that tracked the substance of the

---

circumstances surrounding this incident, including the fact that there was no harm, legally or otherwise[,] to any party [who was] the subject of the reports." As for Allegation 2 (fabricated or falsified reports of DWI arrests), while attempting explanations for some of the discrepancies Strickland had identified, Lang acknowledged that he had reported four DWI arrests that had never actually occurred. The closest Lang came to retracting his previous admissions was in a subsequent amended response, in which he took issue with the prior characterization that he "fabricated" eleven case reports. He emphasized that the events he had recounted in these case reports had actually occurred—albeit in 2003 and 2004, not in 2005 or 2006, as he had represented—and that, at least to that extent, the reports at issue were not entirely fictitious.

[27] Regarding Allegation 3, Strickland concluded that "[e]ven though Trooper Lang takes responsibility" for "mak[ing] up and [estimating] times on HP-3 written warnings," Strickland could not "rule out that an inadvertent time could have been placed on any one of these warnings by someone other than Trooper Lang."

11

allegations set forth in the complaint[28] and identified the legal standards that were violated by each

count.[29] McCraw added that Commission rules provided that any "willful or inexcusable" violation

---

[28] McCraw explained:

The allegations that form the basis for the recommendations are as follows:

**COUNT I**

On various dates between January 1, 2005 and December 31, 2006, you fabricated information entered on case reports (Form THP-1).

**COUNT II**

On various dates between January 1, 2005 and December 31, 2006, you falsified information entered on arrest citations (Form THP-6) claiming DWI charges when no DWI arrests occurred. You reported corresponding false information pertaining to those citations on your weekly reports (Form HP-2).

**COUNT III**

On various dates between January 1, 2005 and December 31, 2006, you falsified information entered on written warnings (Form HP-3). You reported corresponding false information pertaining to those warnings on your weekly reports (Form HP-2).

**COUNT IV**

On various dates between January 1, 2005 and December 31, 2006, you failed to prepare and submit case reports and additional reporting documents in accordance with Departmental policy for custodial arrests.

**COUNT V**

On various dates between January 1, 2005 and December 31, 2006, you failed to submit contraband (drug evidence) that came into your possession to a crime laboratory for analysis and/or destruction.

[29] McCraw determined that Counts I through IV violated General Manual, Chapter 5, Sections 05.56.00 ("Departmental Reports") and 05.10.00 ("Compliance With Law"), and that Count V violated General Manual, Chapter 20, Section 20.10.00 ("Evidence Submitted to a Crime Laboratory").

of law; violation of "any rule, order, requirement, or failure to follow instructions contained in Department manuals"; or "[a]ny act on or off duty which reflects discredit" to DPS "may be deemed sufficient cause for discharge."[30]

McCraw further advised Lang that final action would be withheld pending an opportunity for Lang to informally present any information that would demonstrate "compelling reasons" for the Director to reconsider his preliminary determination. Lang availed himself of that opportunity, and he and his counsel met face-to-face with McCraw later that month. On November 30, 2009, McCraw wrote Lang advising that, having "carefully considered all of the points raised by you and your attorney in our meeting of September 21[,] I have determined that you have not rebutted the charges set out in the statement of charges of September 4 [and that] [n]o cause has been presented to alter my preliminary decision." Accordingly, McCraw discharged Lang from DPS.

**Lang's challenge**

Lang timely appealed his discharge to the Commission, and an evidentiary hearing was held in July 2010. Without objection, DPS put into evidence the agency's record from the investigation, including Strickland's report, Lang's response, and the evidence and exhibits accompanying each. DPS presented the live testimony of Strickland, who recounted his investigations and Lang's admissions, while Lang testified in his own behalf. Although Lang initially made admissions similar to those made previously, he subsequently purported to recant that

---

[30] 37 Tex. Admin. Code § 1.114 (2014) (Tex. Dep't of Pub. Safety, Major Infraction Applicable to Any Employee).

13

testimony after various Commission members began inquiring as to whether or why Lang could or should be prosecuted under criminal law.[31] Instead, Lang began invoking the Fifth Amendment.

However, repudiating his prior admissions was not the primary focus of Lang's defense—in fact, during closing argument, his counsel acknowledged that "a bar complaint would be flying" if she "advised him to testify further today based on the way this hearing has gone." Nor did Lang seriously dispute the concerns of DPS and various Commission members that his past admitted falsehoods rendered him, as one member put it, "useless" as a witness in future criminal prosecutions, "do[ing] more harm on a case . . . than . . . no cop at all." In fact, his counsel granted that Lang "probably" could not be "put . . . back out on the road as a trooper given these concerns." But Lang insisted nonetheless that he was entitled to monetary relief and reinstatement to "another position within DPS that he can work," as his counsel put it, because DPS had violated various procedural requirements in investigating and ultimately discharging him. He also emphasized the commendations and letters of support he had received and had submitted with his response to the formal complaint, suggesting that any misconduct on his part reflected aberrational bad judgment rather than a lasting character flaw. Lang additionally claimed that during his face-to-face meeting with McCraw and his counsel in September 2009, the Director had assured him that he had done "nothing wrong" and "needed to be back on the road." The parties further stipulated that counsel who had been present with Lang during that meeting would, if called, testify to the same effect. Although McCraw's subsequent notice of termination was in evidence, the Director was not called to give live testimony concerning his account of the meeting.

---

[31] *Cf. Garrity*, 385 U.S. at 496-500.

Upon the conclusion of evidence, a three-member majority of the Commission voted to affirm Lang's discharge, with two members abstaining. The Commission's order stated that "[a]fter reviewing all of the evidence presented at the hearing, [it] finds that there is just cause to discharge Edwin K. Lang and affirms the Director's decision." It did not elaborate further on its grounds.

Lang then timely brought suit for judicial review of the Commission's order.[32] At the hearing before the district court, the administrative record from DPS was introduced into evidence, along with the reporter's record from the Commission hearing. The district court rendered judgment affirming the Commission's order and dismissed Lang's claims for relief with prejudice. Lang then timely perfected this appeal of the district court's judgment.

## ANALYSIS

Under the governing APA "substantial evidence" standard of review, we are to reverse and remand an agency's order "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

---

[32] Lang initially filed suit in Cass County, but venue was subsequently transferred by agreement to Travis County district court. *See* Tex. Gov't Code § 2001.176(b)(1).

Lang's claims for relief are based solely on the cause of action for judicial review provided under Chapter 411 and the APA and would lie directly against DPS. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 197-98 (Tex. 2004) (noting that statutes authorizing judicial review of agency orders waive sovereign immunity to that extent). As our caption indicates, Lang named not only DPS but also McCraw, in his capacity as Director, as defendants. However, appellees do not suggest that any distinction between the agency and its human agent is material to the district court's jurisdiction, and we conclude it is unnecessary for us to address whether it is. *See Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 750 (Tex. App.—Austin 2014, pet. filed) (observing that while this distinction might be relevant where jurisdiction rests solely upon the ultra-vires exception to sovereign immunity, it has less significance where a statute waives immunity so as to permit claims directly against the State or its agencies).

15

(A)    in violation of a constitutional or statutory provision;

(B)    in excess of the agency's statutory authority;

(C)    made through unlawful procedure;

(D)    affected by other error of law;

(E)    not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)    arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[33]

Essentially, this is a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record.[34] "The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action."[35] We apply this analysis without deference to the district court's judgment.[36] We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the complaining party bears the burden of demonstrating otherwise.[37] We may affirm the agency's order on any legal theory applicable to the case.[38] And in regard to the underlying

_____

[33] Tex. Gov't Code § 2001.174(2); *see Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 548-49 (Tex. App.—Austin 2011, pet. denied).

[34] *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984).

[35] *Slay*, 351 S.W.3d at 549.

[36] *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

[37] *Charter Med.-Dallas*, 665 S.W.2d at 453; *Granek v. Texas State Bd. of Med. Examr's*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.).

[38] *See Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co.*, 416 S.W.3d 11, 25 (Tex. App.—Austin 2013, no pet.).

factual bases for the agency's order, "'substantial evidence' does not mean a large or considerable amount of evidence"—in fact, the evidence may even preponderate against the agency's finding—but requires only "such relevant evidence as a reasonable mind might accept as adequate to support a [finding] of fact."[39] Likewise, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion."[40]

Lang does not question that the Commission's order is reasonably supported by "substantial evidence" in the sense of having sufficient underlying factual bases—indeed, the Commission heard evidence that Lang admitted to conduct that unquestionably would constitute just cause for his discharge. Rather, Lang brings four issues in which he complains of asserted procedural irregularities in the DPS processes leading to his discharge (issues one and two); that the agency, through Director McCraw, acted arbitrarily and capriciously in discharging him (issue four); and that the Commission itself acted arbitrarily and capriciously by "ignoring" evidence favorable to him (issue three). We can quickly dispense with the latter two issues.

The premise of Lang's third issue, claiming arbitrary and capricious conduct by the Commission, is that the reporter's record from the hearing before that body demonstrates that its members voted to affirm his discharge without considering evidence favorable to him. To demonstrate this, Lang points to on-the-record exchanges in which some Commission members complained that their hearing "notebooks" or bench books prepared by agency staff had not included the exhibits to Strickland's report or Lang's response, including the various commendations

---

[39] *Slay*, 351 S.W.3d at 549.

[40] Tex. Gov't Code § 2001.174(1).

and letters of support on which Lang relied.[41] Lang further emphasizes that one of the abstaining Commission members cited the notebooks issue in claiming that he was not yet prepared to vote, and urges us to infer that the second abstaining member, who did not elaborate as to his rationale, had done so for the same reason. Leaving aside whether these exchanges would be material to our review of the Commission's order,[42] they do nothing to controvert that the entirety of the DPS administrative record was in evidence before the Commission and that the body collectively reached its decision "[a]fter reviewing all of the evidence presented at the hearing," as its order states. In fact, the reporter's record reflects that Commission members actually consulted the administrative record during the hearing, including the evidence on which Lang relied. And even if Lang had raised any doubts in this regard, we would conclude that Lang has failed to demonstrate that any "ignoring" of his evidence could have impacted his substantial rights. The supposedly "ignored" evidence was essentially character testimony whose evidentiary weight was further compromised, to say the least, by the overwhelming evidence of Lang's misconduct, much of which he had admitted. We overrule Lang's third issue.

Similarly without merit is Lang's fourth issue, which is premised on the claim that "uncontroverted" evidence establishes that McCraw "cleared" him of misconduct during their September 2009 meeting. Leaving aside whether any such statements by McCraw would have had

---

[41] Staff explained that the exhibits were quite voluminous, and in fact they comprise roughly 1000 pages of the administrative record.

[42] *See, e.g.*, *Lone Star R.V. Sales, Inc. v. Motor Vehicle Bd. of the Tex. Dep't of Transp.*, 49 S.W.3d 492, 502 (Tex. App.—Austin 2001, no pet.) ("We have previously held that it is immaterial what [an agency member] may have said in arriving at her decision and that we look instead to whether the order is reasonably sustained by appropriate findings and conclusions that have support in the evidence.").

any legal significance, Lang's testimony *is* controverted by other evidence, most notably McCraw's subsequent letter discharging Lang, in which the Director explained that Lang had "not rebutted the charges" against him. Consequently, Lang's claims of being "cleared" by McCraw would, at most, boil down to a credibility dispute that the Commission was well within its discretion to resolve against him.[43] We overrule Lang's fourth issue.

In his remaining two issues, Lang argues that DPS deprived him of "due process" during the internal investigation leading to his discharge. As all parties acknowledge, Chapter 411's just-cause limitation on discharge of DPS personnel gives rise to an entitlement to continued employment that is considered to be a constitutionally protected property right that cannot be deprived absent due process regarding the existence of just cause for termination.[44] Although the precise "process due" such an employee in a given case is somewhat flexible and fact-specific, the

---

[43]    *See Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 511 (Tex. App.—Austin 2007, no pet.) ("The agency determines the meaning, weight, and credibility to assign conflicting evidence, and we may not set aside an agency decision because testimony was conflicting or disputed or because it did not compel the agency's decision.") (citations omitted).

We also observe that Lang's testimony regarding McCraw's supposed "clearing" of him appears to be addressed solely to Allegation 3 (Count III), concerning time discrepancies in warnings Lang had issued:

> [McCraw] asked me—liked me to tell him what happened and how we came to this situation. I started from the very beginning, got halfway through. He picked up the first affidavit that I had read—that I had written for Sergeant Strickland and he asked me a question about the times and warnings. I explained to him, and at that time is when he cut me off and he said—he was kind of agitated. And he looked at me and said, 'Sir, you didn't do nothing wrong. You followed protocol and policy.'"

Any of the five allegations or counts would have sufficed as good cause for discharge.

[44]    *See County of Dallas v. Wiland*, 216 S.W.3d 344, 354 (Tex. 2007); *Bexar Cnty. Sheriff's Civil Serv. Comm'n v. Davis*, 802 S.W.2d 659, 661 & n.2 (Tex. 1990).

19

Due Process Clause and its Texas counterpart require that "prior to any termination, the employer must furnish the employee with 'oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'"[45] "[T]hese procedures . . . 'need not be elaborate,'" especially if "a full post-termination hearing" is provided.[46] But Lang emphasizes that his complaints are not that DPS deprived him of this "constitutional minimum of due process," but that they failed to provide additional "due process" prescribed by Chapter 411, Subchapter B of Chapter 614, and the Procedures. He further invokes—quite understandably, given the state of the administrative record—the concept that his "due process" rights do not depend on the ultimate merits of the just-cause determination.[47]

In his first issue, Lang contends that the formal complaint with which he was served in December 2008 failed to provide him sufficient notice of the allegations against him. Lang argues chiefly that the complaint failed to satisfy the requirements of Subchapter B of Government Code Chapter 614, the statute requiring that any "complaint" against a covered law-enforcement officer be reduced to writing and signed, furnished to the officer "within a reasonable time after the complaint is filed," and that "[d]isciplinary action may not be taken against the officer . . . unless a copy of the signed complaint is given to the officer."[48] Although the text of Subchapter B itself does

---

[45] *Davis*, 802 S.W.2d at 662 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)).

[46] *Id*. at 662-63 (quoting *Loudermill*, 470 U.S. at 545-46).

[47] *See Wiland*, 216 S.W.3d at 356-57 ("'[T]he right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . .'" (quoting *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978))).

[48] Tex. Gov't Code § 614.023(a), (b).

not elaborate regarding any required contents or specificity of such a "complaint," appellate courts, including this Court, have inferred that these and other aspects of the "complaint" requirement must be construed in light of two overarching statutory purposes: (1) reducing the risk that adverse employment actions will be based on unsubstantiated complaints; and (2) ensuring that the accused officer receives sufficient information to enable him to defend against the allegations.[49] Accordingly, this Court has held that allegations wholly omitted from any written complaint cannot serve as a basis for discipline without violating Subchapter B.[50] Nor, one of our sister courts has reasoned, was Subchapter B satisfied by a complaint "express[ing] the conclusions of other peace officers based on general allegations of unidentified people"—e.g., a "feel[ing]" that the accused officer "is threatening to undermine [the] authority [of the] chief and erode the good order and discipline of the department," "has been speaking ill of the department," and has not been acting as "a professional police officer"—because there were "no dates, no names, and no way to investigate" the allegations, let alone any way for the accused officer to defend against them.[51]

Lang insists that the formal complaint against him here falls into the same category. We disagree. As we have previously detailed, Lt. Smith filed a written complaint, on the requisite C-1 form, alleging specific acts of wrongdoing by Lang—that he "fabricated information entered on case reports," "fabricated and/or falsified information entered on arrest citations . . . ," "falsified

_____

[49] *See, e.g.*, *Treadway v. Holder*, 309 S.W.3d 780, 784-85 (Tex. App.—Austin 2010, pet. denied) (quoting *Turner v. Perry*, 278 S.W.3d 806, 823 (Tex. App.—Houston [14th Dist.] 2009, pet. denied)).

[50] *See id.* at 783-85; *see also Guthery v. Taylor*, 112 S.W.3d 715, 721-24 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (no complaint furnished to accused officer).

[51] *Turner*, 278 S.W.3d at 823-24.

21

information entered on written warnings . . . ," "failed to submit contraband (drug evidence) that came into his possession to a crime laboratory for analysis and/or destruction," and "failed to prepare and submit case reports and additional reporting documents in accordance with Departmental policy for custodial arrests"—and citing specific Department rules that Smith maintained were implicated by his allegations. These allegations, in turn, ultimately served as the basis for McCraw's discharge decision[52]—and any one of them would have sufficed as just cause.

In insisting that these allegations were insufficient nonetheless, Lang complains that Smith did not pinpoint specific dates, times, or affected individuals within the "four corners" of the C-1 form, but merely stated that each of the five categories of alleged wrongdoing had occurred "[o]n various dates and at various times between January 1, 2005 and December 31, 2006." Given this generality and temporal breadth, Lang insists, the complaint failed to provide him notice sufficient to enable him to defend against the allegations. At least in the context of the record here, we cannot agree. The record, again, demonstrates conclusively that even before Lang was served with the formal complaint, he had already been confronted with the allegations and evidence against him during the preceding administrative inquiry, had given two lengthy interviews concerning the subject matter of the eventual complaint, and had even admitted to many of the key allegations. Against that backdrop, the allegations as framed by Smith were sufficient notice to Lang as to the

_____

[52] As noted previously, McCraw's pre-termination notice in September 2009 incorporated the substance of the complaint allegations, and his ultimate notice of termination cross-referenced his earlier notice. In this regard, Lang suggests that McCraw's notices failed to satisfy Chapter 411's requirement that Lang be furnished a "written statement giving the reasons for the action taken [that] must point out each commission rule alleged to have been violated by the officer and must describe the alleged acts of the officer that the department contends are in violation of the commission rules." Tex. Gov't Code § 411.007(e-1). However, Lang does not present argument or authorities to support that assertion apart from his contentions based on Subchapter B, and we would reject it for the same reasons.

wrongdoing he was accused of and provided sufficient information to enable him to mount any defense he might have attempted.[53] Accordingly, we overrule Lang's first issue.

Lang's sole remaining issue, his second issue, also invokes Subchapter B. Even if the formal complaint served on him in December 2008 satisfies Subchapter B's requirements, Lang maintains, DPS violated the statute in conducting the administrative inquiry that preceded it. Lang's argument is premised on the view that the internal DPS communications prompting the July 2008 initiation of the administrative inquiry were themselves a "complaint" within the meaning of Subchapter B. Consequently, Lang reasons, DPS violated Subchapter B by failing to provide him a written and signed copy of this "complaint" within a "reasonable time" after it was "filed."[54] Similarly, Lang urges that DPS failed to comply with various Procedures that implement Subchapter B, including a requirement that he be served with a copy of the complaint within ten days after it is filed "where possible and feasible,"[55] and that the investigation be concluded within 28 days absent an extension.[56]

---

[53] *See Harris Cnty. Sheriff's Civil Serv. Comm'n v. Guthrie*, 423 S.W.3d 523, 530-32 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (distinguishing *Turner* and *Guthery* and reasoning that because officer's "own sworn statement corroborate[d] many of the allegations identified as the basis for his termination," it could not be said that he "received insufficient information to allow him to investigate or defend against the complaints"); *see also Fudge v. Haggar*, 621 S.W.2d 196, 197-98 (Tex. Civ. App.—Texarkana 1981, writ ref'd n.r.e.) (complaint was sufficient under Subchapter B's precursor despite failing to list all allegations of misconduct that served as basis for termination where officer was contemporaneously provided with affidavits that referred to other allegations).

[54] Tex. Gov't Code § 614.023(a).

[55] Procedures § 42.02(4).

[56] *Id*. § 42.04(10).

23

Lang fails to demonstrate any reversible error. This Court has previously recognized that an initial failure to comply with Subchapter B's requirements does not categorically mandate a remedy of reinstatement but may be cured, in effect, by furnishing a Subchapter B-compliant "complaint" to the subject officer in advance of the final discharge decision.[57] That occurred here—DPS served Lang with the formal complaint in December 2008, well in advance of his discharge by McCraw, and still longer before the administrative process concerning that decision was finally concluded by the Commission's order. Nor can we conclude that the Commission erred in implicitly concluding that DPS had not violated Subchapter B or related Procedures in the first place because there was no "complaint," as those requirements contemplate, until the formal complaint was filed in December 2008. As previously noted, the rules governing DPS internal investigations have construed and implemented Subchapter B so as to distinguish "complaints," which the rules make subject to that statute's requirements, from "administrative inquiries," which are not.[58] Only if DPS escalates an "administrative inquiry" to a formal "complaint" do the rules impose the Subchapter B notice requirements.[59] The evidence is sufficient to support the Commission's implied finding or conclusion that DPS pursued only an administrative inquiry until the December 2008 formal complaint was initiated—indeed, Lang himself acknowledged that the investigation was initially an "administrative inquiry," not a "complaint," in both his transcribed interviews and in his subsequent adoption of his November 2008 affidavit and interviews "regarding AI-08-107 . . . [to] stand [on their] own . . . regarding C08-154." Nor can we conclude that the

---

[57] *See Bracey v. City of Killeen*, 417 S.W.3d 94, 112-13 (Tex. App.—Austin 2013, no pet.).

[58] Procedures §§ 42.02, .04(11).

[59] *See id*. § 42.04(11)(g), (h).

Commission's application of Subchapter B and related Procedures to these facts is inconsistent with the texts of those provisions or otherwise unreasonable.[60] We overrule Lang's second issue.

**CONCLUSION**

Having overruled each of Lang's issues, we affirm the district court's judgment affirming the Commission's order.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Affirmed

Filed: July 18, 2014

---

[60] *See, e.g.*, *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438-39 (Tex. 2011) (summarizing principles governing review of administrative construction of statutes and rules agency is charged with enforcing).